December 29, 1994 [NOT FOR PUBLICATION] [NOT FOR PUBLICATION]

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

Nos. 93-1877
93-1878
93-1879
93-1880
93-1881
93-2209
93-2300

AETNA CASUALTY SURETY COMPANY,

Plaintiff - Appellee,

v.

P&B AUTOBODY, ET AL.,

Defendants - Appellees.

ARSENAL AUTO REPAIRS, INC., ET AL.,

Defendants - Appellants.

No. 93-1903

AETNA CASUALTY SURETY COMPANY,

Plaintiff - Appellee,

v.

RODCO AUTOBODY, ET AL.,

Defendants - Appellees.

BETTY ARHAGGELIDIS,

Defendant - Appellant.



No. 93-2257

AETNA CASUALTY SURETY COMPANY,

Plaintiff - Appellee,

v.

P&B AUTOBODY, ET AL.,

Defendants - Appellees.

BETTY ARHAGGELIDIS,

Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Chief Judge,

Boudin, Circuit Judge,

and Keeton,* District Judge.

William F. Spallina, with whom Carol A. Molloy was on brief
for defendants Arsenal Auto Repairs, Inc., et al.
Kenneth R. Berman, with whom David A. Guberman and Sherin
and Lodgen, were on brief for defendant Jack Markarian.
James P. Duggan, Alfred E. Nugent, John G. Lamb, Flynn,
Hardy & Cohn, Giovano Ferro II, Ferro, Feeney, Patten & Galante,
Daniel T. Sheehan, Ralph Stein, Edward G. Ryan, Ahmad Samadi,
Joseph S. Carter, William D. Crowe, Crowe, Crowe & Vernaglia and
Abdullah Swei for defendants P Autobody, et al.



* Of the District of Massachusetts, sitting by designation.

David S. Douglas and David O. Brink, with whom Howard S.
Veisz, Kornstein Veisz & Wexler, Glenda H. Ganem and Smith &
Brink, were on brief for plaintiff-appellee Aetna Casualty and
Surety Company.

-3-

KEETON, District Judge. This case concerns an alleged

widespread fraudulent scheme, involving five automobile body

shops and two insurance claims adjusters. The purpose of the

scheme was to obtain payments on fraudulent insurance claims.

Seven appellants, defendants in the trial court,

challenge on numerous grounds the final judgment entered after a

jury trial. The judgment was for Aetna Casualty and Surety

Company ("Aetna") against

(a) Betty Arhaggelidis on the theory of civil

conspiracy in the sum of $373,857.28 plus interest from October

2, 1989 to the date of entry of judgment;

(b) the Tirinkians and the Markarians (the five

individual "Arsenal defendants") for $3,859,901.72 (consisting of

damages of $789,967.24 trebled to $2,359,901.72 under 18 U.S.C.

1962(c) and 1962(d) of the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), and costs, expenses, disbursements

and attorneys' fees of $1,500,000.00) together with prejudgment

interest from October 2, 1989 to the date of entry of judgment;

(c) three of the Arsenal defendants (Zareh Tirinkian,

Peter Markarian, and Jack Markarian) for a separate and

irreducible penalty of $1,579,934.48 under Mass. Gen. L. ch. 93A

in addition to the amount set forth in (b); and

(d) Arsenal Auto Repairs, Inc. ("Arsenal Auto"), a

separate defendant in the action, for the sum of $789,967.24 on a

claim of civil conspiracy plus interest from October 2, 1989 to

the date of entry of judgment.

-4-

For the reasons that follow,1 we affirm.

I. BACKGROUND I. BACKGROUND

We begin this Opinion with a summary of facts as the

jury might have found them; we view the evidence in the light

most favorable to the verdicts. See United States v. Rivera-

Santiago, 872 F.2d 1073, 1078-79 (1st Cir.), cert. denied, 492

U.S. 910, (1989).

One of the body shops, Rodco/P&B Autobody, was owned

and operated by defendant Petros Arhaggelidis, who has not

appealed the judgment against him. He is the husband of

appellant Betty Arhaggelidis. She was the owner of two Mercedes

upon which six fraudulent claims were made to Aetna.

Another of the body shops, Arsenal Auto (also an

appellant in this action), was owned and operated by appellant

Zareh Tirinkian. His wife, Lena Tirinkian, and her brothers John

Markarian and Peter Markarian were employees of Arsenal Auto

during the period of the alleged fraudulent scheme.

Tarja Markarian and her husband Peter Markarian were

the co-owners of a Mercedes upon which two fraudulent claims were

made to Aetna.

From 1987 to 1989, the Arsenal defendants, together


1 The published version of this Opinion includes only the
background statement of facts (Part I) and discussion of those
issues that may be of general interest (Parts II-IX and
Conclusion). The remaining portions of the Opinion (Parts X-XIV)
contain a detailed explanation of the sufficiency of the evidence
to support the jury findings and address other issues that do not
appear to have precedential importance. See First Cir. R. 36.2.

-5-

with employees and friends, submitted sixteen fraudulent

insurance claims to Aetna involving luxury automobiles. Aetna

paid $137,346.83 on these claims. The Arsenal defendants filed

at least ten additional fraudulent claims with other insurance

companies on the same group of cars. The Tirinkians submitted a

total of fifteen fraudulent claims (seven to Aetna) upon which

either Lena or Tareh Tirinkian was the claimant or the insured.

Peter and Tarja Markarian submitted four fraudulent claims (two

to Aetna) on their Mercedes. John Markarian, who filed no claims

in his own name, was the supervisor of repairs at Arsenal Auto,

where most of the cars involved in the fraudulent claims were

stored and purportedly repaired.

Timothy Cummings and Steven Dexter were two of the many

Aetna appraisers who covered the area where Arsenal Auto and the

other body shops were located. Either Cummings or Dexter did the

appraisal for ten of the sixteen fraudulent claims that the

Arsenal defendants (personally or in cooperation with their

friends) filed over a three-year period commencing in 1987.

Cummings and Dexter submitted false appraisals to help the

Arsenal defendants defraud Aetna.

In the district court, judgment was entered by default

against Cummings and Dexter under RICO for $789,967.24 (being the

amount paid out by Aetna on 112 insurance claims submitted to

Aetna that the jury found to be fraudulent) trebled to

$2,359,901.72 plus interest at 12% per annum from October 2, 1989

on the trebled amount, plus $1,500,000 in costs, disbursements,

-6-

and attorneys' fees.

For each of the sixteen fraudulent claims directly

involving the Arsenal defendants and friends cooperating with

them, Aetna, in accordance with its business practices, required

a completed work form to be submitted by the claimant. At trial,

the Arsenal defendants did not provide any documentation that

Arsenal Auto or any other autobody shop completed any of the

repairs in connection with any of the claims. With respect to

some claims, the evidence shows that the claimed accidents never

occurred; in other cases, the claimed damage was intentionally

inflicted. The jury may have supportably inferred that in some

cases defective parts were placed on the cars for the purpose of

appraisal and then later replaced with the original parts.

The jury found that each of the individual Arsenal

defendants was liable for a substantive RICO violation under

1962(c) for participating in the affairs of Aetna through a

pattern of racketeering activity. The jury also found all of the

individual Arsenal defendants liable, under 1962(d), for RICO

conspiracy with the adjusters and the operators of other body

shops (not including Betty Arhaggelidis).

The judgment against the Arsenal defendants was in the

same amount, and on the same calculus, as that against Cummings

and Dexter, explained above.

Appellant Betty Arhaggelidis was associated with the

fraudulent scheme through her husband, the owner of Rodco/P&B

Autobody, one of the five autobody shops involved. Betty

-7-

Arhaggelidis owned two Mercedes, one of which was registered in

her mother's name. These two Mercedes were involved in six

fraudulent claims, as to all of which Cummings did the appraisal.

The jury found that she was liable under a "civil conspiracy"

theory centered around Rodco/P&B Autobody, and therefore was

liable in connection with thirty-seven fraudulent claims.

The appellants challenge the judgments entered against

them on a variety of grounds. In addition, each appellant,

except for Arsenal Auto Repairs, Inc., appeals the district

court's denial of his or her motion for judgment as a matter of

law because of insufficiency of the evidence.

First we consider the issues arising from the

relationships among the RICO counts and the civil conspiracy

count, then we consider other issues raised by one or more of the

appellants.

II. RELATIONSHIPS AMONG COUNTS OF THE AMENDED COMPLAINT II. RELATIONSHIPS AMONG COUNTS OF THE AMENDED COMPLAINT

Appellants, at various points, both in oral argument

and in briefs before this court, have seemed to suggest that the

judgment against them in this case is somehow flawed because of

some aspect of the relationships among the different theories

alleged and tried before the jury. We address specific aspects

of this suggestion in Part III, infra. We address the suggestion

more broadly here.

The district court considered five different theories

(asserted in five different counts) that are relevant to this

-8-

inquiry: three claims of RICO substantive violations, one claim

of RICO conspiracy, and one non-RICO conspiracy claim.

First. Count VII, a RICO substantive
violation under 1962(c) alleging an
association-in-fact enterprise. This
theory was dismissed from the case in the
trial court.

Second. Count VIII, a RICO
substantive violation under 1962(c)
alleging Aetna as the enterprise. The
jury found that this claim was proved
against all individual Arsenal
appellants.

Third. Count VI, a RICO substantive
violation under 1962(c), alleging
Arsenal Auto as the enterprise. The jury
found that this claim was proved against
all individual Arsenal appellants.

Fourth. Count IX, alleging a RICO
conspiracy under 1962(d). The jury
found that this claim was proved against
all individual Arsenal appellants.

Fifth. Count X, common law civil
conspiracy. The jury found that this
claim was proved against all the
appellants, including Arsenal Auto and
Arhaggelidis.

The judgment against the individual Arsenal appellants

jointly and severally in the amount of $2,359,901.72 is supported

by the jury's finding of liability on Counts VIII and IX.

Therefore, if we determine that either the finding on Count VIII

or that on Count IX is supported by sufficient evidence, the

judgment must stand. In fact, as we explain below, we find that

the evidence was sufficient for the jury reasonably to find

liability on both Count VIII (the RICO substantive violation with

Aetna as the enterprise) and Count IX (the RICO conspiracy).

-9-

The Arsenal appellants do not challenge the sufficiency

of the evidence in support of the jury's finding of liability on

Count VI or on Count X. The only argument raised by appellants

with respect to Count VI is an argument regarding pleading

deficiency that we have rejected as wholly without support.

Moreover, because we have determined that the judgment against

the individual Arsenal appellants is supported by jury findings

on Count VIII and Count IX, we have no reason to consider whether

appellants are independently liable under Count VI, Count X, or

both.

The judgment against Arsenal Auto Repairs, Inc. which

is also an appellant in this action, is supported by the jury's

finding of liability on Count X, the civil conspiracy theory.

Arsenal Auto has not challenged the sufficiency of the evidence

supporting the jury's finding with respect to its liability under

Count X. The judgment against Arsenal Auto is affirmed for the

reasons stated in other parts of this Opinion.

The judgment against appellant Arhaggelidis is

supported by the jury's finding of liability on Count X, the

civil conspiracy theory. We conclude that the evidence was

sufficient to support the jury's finding against Arhaggelidis on

Count X.

From this summary, it is clear that one of appellants'

assertions is true: the relationships among transactions,

defendants, and legal claims are complex both legally and

factually. A question remains, however, as to how, if at all,

-10-

any of those complexities or all of them taken together bear upon

any of the issues before this court on appeal.

Nowhere in the trial record, or in their briefs before

this court, except in a passage from their brief that is quoted

in Part III, infra, and an argument that the consolidated case

was too complex for a jury to understand, App. Brief at 59-61,

did the appellants ever clearly formulate an argument or set of

arguments based upon their hints and innuendos about complexity.

Nevertheless, we have read with special care all parts

of the briefs containing such hints or suggestions. We have done

so, first, to be certain we have not overlooked any argument

presented and, second, to assure that we have taken into account

any cited cases that might bear upon the issues presented by a

fact pattern as complex as that before us, with interlocking

personal, family, and institutional relationships.

Entirely apart from the complexities added by RICO, a

risk of confusion has long existed because of relationships among

different legal and factual theories of conspiracy that might be

invoked by the parties or by a court. The law bearing upon the

potential consequences of invoking different theories of

conspiracy is more extensively developed in criminal cases than

in civil. Even with respect to the criminal context, however,

relevant statutes and precedents provide only limited guidance

for structuring factual and legal analysis.

In criminal cases, issues arise often with respect to

whether a case should be viewed as one involving:

-11-

(1) a single conspiracy of many parties, multiple

objectives, and broad sweep;

(2) multiple independent conspiracies; or

(3) a nest of interlocking conspiracies that may

involve overlapping conspiracies or smaller, discrete inner

conspiracies of fewer persons and smaller scope that are tied in

with a larger conspiracy whose members include some but not all

of the members of the discrete inner conspiracies.

See, e.g., United States v. Glenn, 828 F.2d
855 (1st Cir. 1987).

One result of this range of possible interpretations of the

evidence in a particular case is that a question concerning legal

theory and arguments based upon it, and concerning instructions

explaining the law to the jury, is difficult and "is probably not

susceptible to an abstract answer unrelated to context."

United States v. Oreto, No. 91-1769, slip
op. at 19 (1st Cir. Oct. 4, 1994).

The persons alleged to be RICO conspirators and civil

conspirators in the present case, like those charged under a non-

RICO conspiracy theory in Oreto

have engaged in a series of transactions
that could be viewed as a set of separate
conspiracies, or one overall conspiracy
embracing numerous wrongful transactions,
or . . . both an overarching conspiracy
and a nest of underlying smaller
conspiracies. Partly this is a problem
of proof and inference; partly the
problem arises from trying to squeeze
into the conceptual cubbyhole of "an
agreement" activities that in practice
often have the more shapeless character
of an evolving joint criminal
enterprise.

-12-

Id. at 20 (citations and reference to
double jeopardy omitted);
see also United States v. Sep lveda, 15
F.3d 1161, 1191 (1st Cir. 1993), 114 S.Ct.
2714 (1994)("[T]he fact that the
organization's methods and tactics evolved
over time did not dictate a finding of two,
three, or four separate conspiracies.").

In a criminal context, the prosecutor is allowed some

choice of theory, though the choice may be burdened with

consequences, including those incident to the law of double

jeopardy.

In a civil context, likewise, parties may be allowed

some choice of theory. But the choice, in the civil context

also, may be burdened with consequences -- a point to which we

return below.

In this case, added layers of complexity incident to

relationships among theories exist, not only because of the

relationships between different conspiracy counts -- Count IX

(RICO conspiracy) and Count X (civil conspiracy) -- but also

because of the relationships among these counts and the counts

alleging RICO substantive violations (Counts VII and VIII).

Also, as in criminal cases, see, e.g., Oreto, No. 91-1769, slip

op. at 19, an answer as to what significance, if any, the legal

and factual theories may have, must be context sensitive.

Because procedural law allows alternative contentions,

parties to a civil action involving such an array of factual and

legal theories as this case presents may be allowed to defer

choice at least until late stages of proceedings in the trial

court. For example, both plaintiffs and defendants in a civil

-13-

case may be allowed to maintain alternative contentions at least

until the evidence is closed, when the court may require some

choices to be made about the form of verdict to be used in

submitting the case to the jury -- see Fed. R. Civ. P. 49 -- and

about instructions to the jury. When a party does not request

either a "special question" or an instruction submitting a

particular theory of conspiracy to the jury, that party makes a

choice that has the associated consequence of almost certainly

precluding the assertion after verdict of the omitted theory of

conspiracy. See, e.g., Fed. R. Civ. P. 49. The law (a

procedural rule, in this instance) allows choice, but it may

limit the scope of choice by defining consequences that are

attached to each of the available options, rather than allowing

complete freedom of choice. A party making a choice of this

kind, among legally defined options only, is making an "election"

in the classic sense. See John S. Ewart, Waiver or Election, 29

Harv. L. Rev. 724 (1916).

Of course, a trial court may in some circumstances

allow submission to a jury of two or more theories, with

appropriate instructions explaining as to each theory the factual

elements the jury must find to return a verdict sustaining that

theory. The different theories submitted to a jury may be

factually compatible -- that is, a verdict sustaining all

theories submitted may be permissible. Also, however, the

evidence and the different theories of conspiracy submitted to a

jury in a particular case may be so factually incompatible that

-14-

the jury's choice is limited to finding one or another of the

theories supported, but not all.

In the present case, the trial judge, in submitting the

case to the jury, used a verdict form that at first glance might

appear to be a submission on "special questions," with no

"general verdict," under Fed. R. Civ. P. 49(a). Closer

examination, however, of both the verdict form and the record of

colloquies about it, discloses that the court required only a

general verdict of the jury, under Fed. R. Civ. P. 49(b), as to

each claim against each defendant, after elimination of claims

that were alleged but as to which either the court rejected the

claim as a matter of law (the association-in-fact conspiracy

theory alleged in Count VII) or Aetna elected not to request

submission to the jury.

The submission of a separate question requiring the

jury to report an answer as to each of at least 122 of the 176

allegedly fraudulent claims was necessary because disputed

factual issues were presented not only with respect to whether an

alleged RICO conspiracy and the alleged RICO substantive

violations existed, and, if so, what defendants were liable under

each theory, but also with respect to whether each of the

transactions was within the scope of the conspiracy or

substantive violation. The answers have a bearing on the terms

of the judgment to be entered, even though the trial judge

determined (supportably, we have concluded) that no genuine

dispute of fact existed as to the amount paid by Aetna on each of

-15-

the 112 claims the jury found to be fraudulent.

In summary, we conclude that the verdicts and judgment

for plaintiff against the appellants are supported by the

evidence received in this case, and by law.

III. SUFFICIENCY OF PROOF III. SUFFICIENCY OF PROOF

A. Standard of Review

Appellants challenge the sufficiency of the evidence to

support the judgment entered against them. They argue that the

district court should have granted their motions for judgment as

a matter of law.

The district court may grant a motion for judgment as a

matter of law only if, after examining the evidence and all

reasonable inferences therefrom "in the light most favorable to

the nonmovant," it determines that "the evidence could lead a

reasonable person to only one conclusion," favorable to the

movant. Gallagher v. Wilton Enterprises, Inc., 962
F.2d 120, 124 (1st Cir. 1992)(quoting
Hendricks & Associates, Inc. v. Daewoo Corp.,
923 F.2d 209, 215 (1st Cir. 1991)).

A denial of judgment as a matter of law is "reviewed de novo,

which means that we use the same stringent decisional standards

that control the district court." Id. at 125.

With respect to the five individual Arsenal defendants,

appellee argues that the judgment in the amount of $2,369,901.72

is supported, independently, by each of two jury findings --

first, the finding that all individual Arsenal defendants are

liable on a theory of RICO substantive violation with Aetna as

-16-

the enterprise under 1962(c) (Count VIII) and, second, the

finding that all individual Arsenal defendants are liable on a

theory of RICO conspiracy under 1962(d) (Count IX). With

respect to defendant Betty Arhaggelidis, the appellee argues that

the judgment in the amount of $373,857.28 is supported by the

jury finding that she was liable on a theory of civil conspiracy.

We examine the evidence supporting each of these theories against

each defendant in Parts III.C, III.D, and III.E, infra.

B. Appellants' Preclusion Argument Based on the

Relationship of Count VII to Other Counts

The appellants challenge the district court's denial of

their motion for judgment as a matter of law on Count VIII, the

RICO substantive charge alleging Aetna as the enterprise, and

Count IX, the RICO conspiracy charge. They contend that once the

district court granted defendants' motion for judgment as a

matter of law on Count VII (the RICO substantive violation

alleging an association-in-fact enterprise including all

defendants), the district court should have granted, also,

defendants' motion for judgment as a matter of law on Counts VIII

and IX. (This argument was not made in the trial court as to

defendants' motion for judgment as a matter of law on Count VI,

nor is it asserted on appeal. Count VI, alleging Arsenal Auto as

the enterprise, alleges a scheme of a smaller scope than that

alleged in Count VII. Thus, no plausible argument can be made

that the court's dismissal of Count VII requires the dismissal of

Count VI.)

-17-

Appellants do not clearly state the legal premises of

their preclusion argument. Reading generously to appellants,

however, to assure that we address any contention that might even

plausibly be presented, we infer that some asserted principle of

preclusion is at least implicitly if not explicitly suggested.

For example, appellants say:

The trial judge's ruling directing a
verdict for all Defendants on Count VII
of the Complaint, because there was
"insufficient evidence to sustain Count
7, an overall association-in-fact
enterprise," (App. 4092), separated the
Arsenal Defendants from the other
Defendants in the case and thereby
disassociated [sic] the actions of the
Allston Group from the acts of the
Arsenal Defendants. Without the
association-in-fact enterprise to meld
the acts of the various Defendants into
an overall conspiracy, the link between
the Arsenal Defendants and the Allston
Group was severed thereby absolving the
Arsenal Defendants from any wrongdoing
concerning bribery. As such, the trial
judge's ruling, by implication, absolved
the Arsenal Defendants from bearing the
burden of the Allston Group's bribery.

Appellants' Brief at 41-42.

It is true that each of Counts VII, VIII, and IX

alleges a fraudulent scheme that includes all the body shops.

These three theories have the same "scope" in the sense that each

of them would support the judgment against the Arsenal individual

defendants in the amount of $2,369,901.72. Nevertheless, each

count asserts a distinctive theory, and none of the three

theories has all of the elements of any other of the three.

Counts VII and VIII allege RICO substantive violations under

-18-

1962(c), but the entities alleged as the enterprise are

different. In contrast to these substantive violations, Count IX

alleges a RICO conspiracy under 1962(d).

Since each of the three counts requires different

elements of proof, the appellants are incorrect when they say

that the dismissal of one of these counts, namely Count VII,

requires the dismissal of one or both of the other two counts.

Although the appellants' argument fails as a matter of

law, we proceed to consider the possibility of some other

implicit premise that may have led to such a patently incorrect

statement of law.

One premise that may be inferred from appellants'

argument is that in order to prove Count VIII, the RICO

substantive violation with Aetna as the enterprise, the plaintiff

had to prove the same relationships between the defendants that

were essential to the association-in-fact enterprise alleged in

Count VII. This assumption is incorrect.

Section 1961 defines an "enterprise" for the purposes

of RICO to include "any individual, partnership, corporation . .

. or other legal entity, and any union or group of individuals

associated-in-fact although not a legal entity." 18 U.S.C.

1961(4). Thus to satisfy the "enterprise" element of a RICO

substantive violation, a plaintiff may prove either the existence

of a legal entity, such as a corporation, or that a group of

individuals were associated-in-fact. Since Aetna is a

corporation, Aetna can constitute an "enterprise" for the purpose

-19-

of Count VIII, even if there is no proof of an association-in-

fact enterprise.

In contrast, Count VII requires proof of an

association-in-fact enterprise. An association-in-fact

enterprise is an "ongoing organization," with members

"function[ing] as a continuing unit," which is "separate and

apart from the pattern of racketeering in which it engages."

United States v. Turkette, 452 U.S. 576, 583 (1981).

Since no party has challenged the district court's

grant of the defendants' motion for judgment as a matter of law

on Count VII, we need not determine the precise elements required

for a plaintiff to prove an association-in-fact enterprise.

Nevertheless, it is clear that an association-in-fact enterprise

is different from an enterprise that is a legal entity, like

Aetna. Since different proof is required to establish these

different kinds of an enterprise, the court's determination as a

matter of law in favor of the defendants on Count VII is

consistent with the court's determination that fact issues

remained for the jury to decide with respect to Count VIII.

Another possible premise, which is not explicitly

articulated or acknowledged by the appellants, is that in order

to prove a RICO conspiracy of the scope alleged in Count IX, the

plaintiff was required to prove the existence of an association-

in-fact enterprise of that same scope.

This premise is not valid. Section 1962(d) does not

require proof of an association-in-fact enterprise. Any

-20-

enterprise meeting the definition of enterprise in 1961 will do.

Under 1961 an enterprise may include a legitimate legal entity

like Aetna as the victim of the racketeering activity. This

court has previously upheld convictions under both 1962(c) and

1962(d), that alleged a victim enterprise like Aetna.

See United States v. Boylan, 898 F.2d 230
(1st Cir.), cert. denied, 498 U.S. 849 (1990)
(victim enterprise was the Boston Police
Department).

Therefore, in order to satisfy the enterprise element of a RICO

conspiracy of the scope alleged in Count IX, the plaintiff needed

only to prove some kind of enterprise of that scope, not

necessarily an association-in-fact enterprise. In the case at

hand, proving a RICO conspiracy with Aetna as the enterprise was

sufficient.

For these reasons, the trial judge's ruling as a matter

of law for defendants on Count VII, based on the conclusion that

there was not enough evidence to go to the jury on the theory of

an "association-in-fact" enterprise, is entirely consistent with

the jury findings of a 1962(c) substantive violation (with Aetna

as the victim enterprise) and of a 1962(d) conspiracy (with

Aetna as the victim enterprise).

C. Substantive RICO Violation Under 1962(c) with

Aetna as the Enterprise -- Count VIII

For an individual defendant to be liable for a RICO

substantive violation under 1962(c), with Aetna as the

enterprise, the evidence must be sufficient for the jury to find

-21-

that (1) Aetna was an enterprise affecting interstate or foreign

commerce, (2) that the defendant under consideration associated

with the enterprise, (3) that this defendant participated in the

conduct of the enterprise's affairs, and (4) that this

defendant's participation was through a pattern of racketeering

activity. 28 U.S.C. 1962(c).

We consider, whether the evidence was sufficient to

prove each of these elements against each of the defendants the

jury found liable under Count VIII.

First Element. Aetna is an "enterprise affecting

interstate commerce" within the meaning of 1962(c). The major

purpose of RICO is to protect legitimate business enterprises

from infiltration by racketeers. "Enterprise" as used in this

act, includes legitimate corporations. See United States v.

Turkette, 452 U.S. 576, 101 S.Ct. 2524 (1981). Since Aetna is a

major property and casualty insurer doing business in many

states, Aetna's conduct of its business "affects interstate

commerce."

See United States v. South-Eastern
Underwriters Ass'n, 322 U.S. 533 (1944) (a
fire insurance company that conducts a
substantial part of its business transactions
across state lines is engaged in "commerce
among the several states" and is subject to
regulation under the Commerce Clause).

Appellants argue that Aetna cannot constitute the

"enterprise" because the alleged racketeering activities were to

the detriment and not the benefit of Aetna. This argument rests

on a misinterpretation of the RICO statute. The statute does not

-22-

require that the pattern of racketeering be in furtherance of the

enterprise. In United States v. Boylan, this court upheld the

convictions of Boston police detectives who violated RICO by

illegally participating in the affairs of the Boston Police

Department (the enterprise), through a pattern of racketeering by

accepting bribes. Boylan, 898 F.2d 230. In Boylan, as in this

case, the affairs of the enterprise were undermined by the

illegal activity.

See also Yellow Bus Lines, Inc. v. Drivers
Chauffeurs & Helpers Local Union 639, 913
F.2d 948, 952 (D.C. Cir. 1990), cert. denied,
501 U.S. 1222 (1991)("Section 1962(c) nowhere
requires proof regarding the advancement of
the enterprise's affairs by the defendant's
activities or proof that the enterprise
itself is corrupt . . . .");
United States v. Provenzano, 688 F.2d 194
(3rd Cir.), cert. denied, 459 U.S. 1071
(1982)(RICO is not limited to racketeering
activities that advance or benefit the
enterprise, but also encompasses racketeering
activities that work to the detriment of the
enterprise).

Second Element. Appellants, who are not employees of

Aetna, attempt to distinguish Boylan by pointing out that in

Boylan the defendants were employees of the organization that

constituted the RICO enterprise. Appellants argue that the

statute prohibits employees from conducting an enterprise's

affairs through a pattern of racketeering activity to the

detriment of the enterprise, but does not prohibit persons who

are merely associated with the enterprise from conducting the

enterprise's affairs to its detriment through a pattern of

racketeering activity.

-23-

The proposed distinction is not supported by the

language of the statute, which refers to "person[s] employed by

or associated with any enterprise." 18 U.S.C. 1962(c)(emphasis

added). Nor is it supported by any identifiable public policy or

by precedent.

See, e.g., United States v. Yonan, 800 F.2d
164 (7th Cir. 1986) cert. denied, 479 U.S.
1055 (1987)(upholding conviction of attorney,
who was not an employee of the enterprise, a
prosecutor's office, for violating RICO by
conducting the affairs of the prosecutor's
office through bribery);
United States v. Bright, 630 F.2d 804, 830-
31 (5th Cir. 1980) (upholding RICO conviction
of a bail bondsmen, who was not an employee
of the enterprise, a sheriff's office, for
unlawfully participating in the affairs of
the enterprise through bribery).

Appellants also argue that the defendants cannot be

held liable for a RICO substantive violation with Aetna as the

enterprise because they were not even "associates" of the

enterprise, but were outsiders and, as outsiders, could not be

said to "have participated in the conduct" of Aetna's affairs.

This is an argument more of words than substance. The statute

uses the phrase "associated with" rather than creating a category

of "associates," narrowly defined to include fewer persons than

those who may be said to have "associated with" an enterprise in

a broader sense of this phrase. In ordinary usage, one who, for

example, buys an insurance policy from an enterprise and depends

on the solidarity of that enterprise, for protection against

defined risks, has an association with, and may be said to have

"associated with," the enterprise.

-24-

Each of the individual appellants was either an insured

or a claimant under an Aetna policy, or an owner or operator of a

body shop involved in repairing automobiles insured by Aetna.

Three of the five individual Arsenal appellants (the Tirinkians

and Peter Markarian) were both insureds and operators. As an

insured, a claimant, or a body shop operator, each of the

appellants was in a contractual relationship with Aetna. The

body shop (also an appellant) and its owners and operators were

"associated with" Aetna because each body shop about which

evidence was received at trial was a place where Aetna employees

conducted appraisals and where cars that were the subject of

insurance were purportedly repaired.

Third Element. Appellants argue that no reasonable

jury could have found that the appellants "participated directly

or indirectly in the conduct of the enterprise's affairs" because

the defendants did not "participate in the operation or

management of the enterprise itself." Reves v. Ernst & Young,

113 S.Ct. 1163 (1993).

Contrary to the appellants' assertion, there was

sufficient evidence for a reasonable jury to find that the

defendants' activities met the definition of "participation"

adopted by the Supreme Court in Reves, which is known as the

"operation or management" test. Id. at 1172. Appraising

allegedly damaged vehicles and investigating, processing, and

paying automobile insurance claims are vital parts of Aetna's

business. By acting with purpose to cause Aetna to make payments

-25-

on false claims, appellants were participating in the "operation"

of Aetna.

The Supreme Court in Reves interpreted the phrase

"conduct of the enterprise's affairs" to indicate a "degree of

direction," which the court described as taking "some part in

directing the enterprise's affairs." Id. at 1170. The evidence

was sufficient to support a finding that the individual Arsenal

defendants' activities affected, in a material degree, the

direction of Aetna's affairs by employees of Aetna. Appellants'

activities caused Aetna employees having authority to do so to

direct that other employees make payments Aetna otherwise would

not have made. The Court in Reves emphasized that, as in this

case, the defendants' "participation" could be "indirect" in the

sense that persons with no formal position in the enterprise can

be held liable under 1962(c) for "participating in the conduct

of the enterprise's affairs." Id. The evidence was sufficient

to support a finding that each of the appellants participated in

the conduct of Aetna's affairs in this way.

Moreover, in Reves the court expressly recognized that

"an enterprise also might be operated or managed by others

'associated with' the enterprise who exert control over it as,

for example, by bribery." Id. at 1173. When viewed in the light

most favorable to the plaintiff, in support of the verdict in

this case, the evidence supports a finding that appellants caused

the Aetna appraisers to approve false claims and conduct their

appraisals in a manner contrary to Aetna's business practices and

-26-

caused Aetna to pay out large sums of money on false claims. The

evidence was sufficient to support a finding that appellants

exerted control over the enterprise, if not by bribery (the

example given by the Court in Reves), then at least by other

methods of inducement. Since a reasonable jury could find that

the appellants exerted some control over Aetna and took part in

directing some aspect of the enterprise's affairs, the

appellants' actions could be found to have satisfied the

"operation or management" test.

Fourth Element. The final element necessary to support

liability under 1962(c) is that each defendant's participation

was "through a pattern of racketeering activity." In order to

establish a pattern of racketeering activity, the evidence must

show that each defendant committed two acts of racketeering

activity within the span of ten years. The predicate acts are

defined by 18 U.S.C. 1961 to include mail fraud, wire fraud, and

bribery as well as aiding and abetting these offenses.

See Oreto, No. 91-1769, slip op. at 27
(jury could find a pattern of racketeering
activity for the purposes of 1962(c) if the
appellants aided and abetted the commission
of at least two predicate acts);
see also Pereira v. United States, 347 U.S.
1, 9 (1954)(a person who aids and abets
another in the commission of mail fraud, a
violation of 1341, also violates 1341);
18 U.S.C. 1961 (violations of 1341
constitute predicate racketeering activity).

Although these terms refer to criminal offenses to

which the beyond-reasonable-doubt burden of proof applies, a

plaintiff in a civil RICO action may prove these acts by a

-27-

preponderance of the evidence.

See Combustion Engineering, Inc. v. Miller
Hydro Group, 13 F.3d 437, 466 (1st Cir.
1993)(the preponderance of the evidence
standard applies to fraud claims in civil
RICO proceedings);
see also Moss v. Morgan Stanley, Inc., 553
F. Supp. 1347 (S.D.N.Y.), aff'd 719 F.2d 5
(2d Cir. 1983), cert. denied sub nom. Moss v.
Newman, 465 U.S. 1025 (1984) (although proof
in civil proceedings under RICO requires only
a preponderance of the evidence, which is a
lower standard of proof than in criminal
proceedings, the standard does not relate to
the elements of the predicate crimes, but to
the burden that the plaintiff bears in
showing the elements).

The elements of a mail fraud violation are a scheme to

defraud and the use of the mails to execute or further this

scheme.

United States v. Brien, 617 F.2d 299, 311
(1st Cir.), cert. denied, 446 U.S. 919
(1980).

The plaintiff alleged that each defendant committed predicate

acts of mail fraud.

The intentional filing of false insurance claims or

false completed work forms in order to obtain payments from Aetna

constitutes a "scheme to defraud" Aetna. The plaintiff does not

need to prove that each defendant personally used the mails but

only that the defendant acted "with knowledge that the use of the

mails will follow in the ordinary course of business, or [acted

in circumstances] where such use can be reasonably foreseen."

United States v. Maze, 414 U.S. 395, 399 (1974). In this case,

it could reasonably be foreseen by each defendant that either an

insured, a claimant, a body shop or an appraiser would use the

-28-

mails in connection with each of the fraudulent claims, or that

Aetna would use the mails to send payments to the recipients.

All of these uses of the mails were in furtherance of the

defendants' fraudulent scheme.

See United States v. Martin, 694 F.2d 885,
890 (1st Cir. 1982) (refund checks mailed by
an insurance company to the defendant, an
insurance agent, were closely enough related
to the agent's insurance fraud scheme to
bring his conduct within the statute).

In addition to proof of at least two predicate acts,

there must be evidence of "continuity" sufficient to show that

the predicate acts constitute a "pattern" of racketeering

activity. Boylan, 898 F.2d at 250. Continuity may be

established by proving that the predicate acts "form a closed

period of repeated conduct" or that they "are a regular way of

conducting the enterprise."

Id.;
see also Digital Equipment Corp. v. Curie
Enterprises, 142 F.R.D. 16 (D. Mass.
1992)(holding that the use of the mails forms
a "pattern of racketeering activity" if the
uses are related and they amount to, or pose
threat of, continued illegal activity).

The evidence of the ongoing succession of fraudulent claims

presented in this case easily satisfies this requirement.

The appellants do not dispute that each fraudulent

claim is an act of mail fraud and that mail fraud is sufficient

to constitute a predicate offense under the RICO statute.

Similarly, the appellants do not contend that the fraudulent

insurance claims were unrelated or so dissimilar as to lack the

continuity necessary to establish a "pattern" of racketeering

-29-

activity. The appellants simply contend that there was no

evidence of fraud on the part of any of the appellants. We have

concluded that this assertion is contrary to the record.

D. RICO Conspiracy under Section 1962(d) -- Count IX

In addition to finding the individual Arsenal

defendants liable for a RICO substantive violation with Aetna as

the enterprise, the jury also found each of the individual

Arsenal defendants liable for a RICO conspiracy violation under

1962(d). Liability on this theory is proved against a defendant

by showing (1) the existence of enterprise affecting interstate

commerce, (2) that the defendant knowingly joined the conspiracy

to participate in the conduct of the affairs of the enterprise,

(3) that the defendant participated in the conduct of the affairs

of the enterprise, and (4) that the defendant did so through a

pattern of racketeering activity by agreeing to commit, or in

fact committing, two or more predicate offenses. See Boylan, 898

F.2d at 241.

Even though no party objected (on grounds relevant

here) to the trial court's charge to the jury on the elements of

the alleged RICO conspiracy (as well as the elements of the

alleged RICO substantive violations), we have examined the charge

to the jury and determined it to be consistent with the elements

of a RICO conspiracy as we have stated them here. In arriving at

this formulation, we have been sensitive to the fact that earlier

cases in this circuit used the phrase "knowingly joined the

-30-

enterprise."

United States v. Angiulo, 847 F.2d 956, 964
(1st Cir.), cert. denied, 488 U.S. 928
(1988);
United States v. Winter, 663 F.2d 1120,
1136 (1st Cir. 1981), cert. denied, 460 U.S.
1011 (1983).

In Boylan, the court first used this same phrase ("knowingly

joined the enterprise"), 898 F.2d at 241 (emphasis added), but in

a passage following shortly thereafter referred to whether the

defendants had knowingly joined the conspiracy.

Id. ("Our inquiry thus reduces to whether
such a conspiracy, knowingly joined by all
defendants, was satisfactorily proven.").

In Boylan (and perhaps the earlier cases as well), this

difference in phrasing was immaterial to the outcome of the case.

This was so in Boylan because the evidence was undisputed that

all of the defendants alleged to have joined the conspiracy were

indisputably employees of the Boston Police Department, the

alleged enterprise. In the present case, on the other hand,

plaintiff alleged that defendants who were not employees of Aetna

(the enterprise in Count VIII) knowingly joined the conspiracy.

For this reason we have addressed the issue more precisely in our

formulation, stated above, of the elements of a RICO conspiracy,

as applied to this case.

We conclude that the issue we must consider is not

whether the defendants knowingly joined the victim enterprise (as

first phrased in Boylan) but (as later stated in that Opinion)

whether the defendants knowingly joined a conspiracy. We

conclude that the evidence is sufficient to support a finding

-31-

that each of the appellants "knowingly joined" the 1962(d) RICO

conspiracy.

The alleged 1962(d) RICO conspiracy (Count IX) was a

conspiracy to violate 1962(c). The major difference between a

violation of 1962(c) itself (such as Count VIII) and a violation

of 1962(d) based on 1962(c)(such as Count IX) is the additional

required element that the defendant knowingly joined a conspiracy

to violate 1962(c). Another difference is that, to prove that a

defendant violated 1962(c), it is necessary for the plaintiff to

prove two predicate offenses; under 1962(d), in contrast, this

is not an element required to be proved. To prove a violation of

1962(d), it is enough to prove that a defendant agreed with one

or more others that two predicate offenses be committed. See

Boylan, 898 F.2d at 252. In the present case, this latter

difference is of no practical consequence because we conclude

that there was sufficient evidence to support a finding that each

defendant in fact committed two predicate offenses.

One assertion, perhaps implicit in the appellants'

argument, is that, in order to prove each defendant liable for

RICO conspiracy (a 1962(d) violation), the plaintiff was

required to prove a conspiracy to defraud Aetna in which each of

the Arsenal defendants conspired directly with one or more

persons associated with each of the other body shops.

This assertion is incorrect because it depends

necessarily upon a misinterpretation of 1962(d) with respect to

the elements necessary to prove a RICO conspiracy. It is true

-32-

that to find a defendant liable under 1962(d) one must find that

the defendant conspired to violate a subsection of 1962. It is

not necessary, however, to find that each defendant knew all the

details or the full extent of the conspiracy, including the

identity and role of every other conspirator.

Boylan, 898 F.2d at 242 ("A RICO conspiracy
does not demand . . . that all defendants
participate in all racketeering acts, know of
the entire conspiratorial sweep, or be
acquainted with all other defendants.")

All that is necessary to prove this element of the RICO

conspiracy, against a particular defendant, is to prove that he

or she agreed with one or more co-conspirators to participate in

the conspiracy. Moreover, it is not necessary for the

conspiratorial agreement to be express, so long as its existence

can plausibly be inferred from words, actions, and the

interdependence of activities and persons involved. United

States v. Concemi, 957 F.2d 942, 950 (1st Cir. 1992). In this

case, the jury reasonably could have found that, although each

defendant may not have known the entire sweep of the conspiracy,

each defendant knew that he or she was a part of a larger

fraudulent scheme. For example, since the evidence supported a

finding that each of the Arsenal defendants was well aware of the

fraudulent business practices of Dexter and Cummings, the jury

could find that all of the Arsenal defendants knew they were part

of a larger conspiracy in which other persons made uses similar

to their own of fraudulent appraisals by Dexter, Cummings, or

both.

-33-

A defendant who does not know the "entire

conspiratorial sweep" is nevertheless jointly and severally

liable, in the civil context, for all acts in furtherance of the

conspiracy. Using a common metaphor, one may say that Cummings

and Dexter, the Aetna appraisers, were at the hub of the overall

RICO conspiracy, providing the central point through which all

the defendant body shops were connected. A jury could reasonably

find that, through Cummings and Dexter, the conspiratorial sweep

extended to all the body shops and most, if not all of the

individual defendants. The jury in this case found that the RICO

conspiracy included all other appellants, except for Arsenal Auto

Repairs, Inc. and Betty Arhaggelidis. We need not consider

whether the evidence would have supported a finding against these

two appellants as well. That was not essential to the liability

of others under this theory, nor to the liability of these two

appellants under a different theory.

From evidence of the extensive dealings of all other

appellants with Cummings and Dexter, the jury could have inferred

an agreement, to defraud Aetna, among all of the Arsenal

defendants (Arhaggelidis not being an Arsenal defendant) and the

appraisers. Through evidence of each individual Arsenal

defendant's actions, the jury could infer that each defendant had

the requisite state of mind for a RICO conspiracy violation --

knowing participation.

See Boylan, 898 F.2d at 242 ("[The
plaintiff] may prove [a RICO conspiracy]
through the use of circumstantial evidence,
so long as the total evidence, including

-34-

reasonable inferences, is sufficient to
warrant [the jury's findings].").

The appellants do not dispute that Dexter and Cummings

conspired with the owners and operators of the other body shops.

Through Dexter and Cummings, the Arsenal defendants were linked

to all the other defendants who were found liable for RICO

conspiracy. Thus, upon proof that each defendant committed or

agreed to the commission of two predicate offenses, each

defendant could be held liable for the overall RICO conspiracy.

Moreover, although it was not necessary for the

plaintiff to prove that the Arsenal defendants knew the identity

of defendants from the other body shops and conspired directly

with them, the evidence was sufficient for the jury to infer that

this was in fact the case. For example, Zareh Tirinkian

testified that he frequently attended parties and other social

engagements with the operators of the other body shops. Although

Tirinkian denied discussing his practice of filing fraudulent

insurance claims with the other body shop owners, the evidence

showed that the body shops' racketeering activities were

unusually similar. The body shops all defrauded Aetna, they

reported nearly identical types of fraudulent claims, and they

obtained appraisals from the same appraisers. Evidence of these

similarities, considered along with other evidence, was

sufficient to support a jury finding that the owners of the body

shops conspired directly with one another.

Id. at 242 (a jury may infer that a single
overall conspiracy existed when evidence of
racketeering acts shows "hallmarks of

-35-

similarity" and "a significant degree of
interconnectedness").

E. Civil Conspiracy -- Count X

Defendant Arsenal Auto Repairs, Inc. was not held

liable under any RICO theory. The judgment against Arsenal Auto

rests instead, upon the jury's finding that Arsenal Auto was

liable for civil conspiracy. The appellants' brief does not

challenge this finding against Arsenal Auto on the basis of

insufficiency of the evidence. For this reason, the following

discussion of civil conspiracy concerns Arhaggelidis's appeal

only.

Appellant Arhaggelidis challenges the judgment entered

against her for civil conspiracy on the ground of insufficiency

of the evidence. The plaintiff alleged that Ms. Arhaggelidis

conspired with her fellow Rodco/P&B Autobody defendants to

defraud Aetna.

The nature of a "civil conspiracy" and the proof

required to invoke this type of claim differ significantly from

those applying to criminal conspiracies generally and to RICO

conspiracies in particular. Under Massachusetts law, either of

two possible causes of action may be called "civil conspiracy."

First. There is precedent supporting a "very limited

cause of action in Massachusetts" for "civil conspiracy" of a

coercive type. See Jurgens v. Abrams, F. Supp. 1381, 1386 (D.

Mass. 1985). "In order to state a claim of [this type of] civil

conspiracy, plaintiff must allege that defendants, acting in

-36-

unison, had some peculiar power of coercion over plaintiff that

they would not have had if they had been acting independently."

Id. (quotations omitted)(citing Fleming v.
Dane, 22 N.E.2d 609 (Mass. 1939)).

Plaintiff, in paragraph 480 of Count X of its

complaint, does allege a circumstance that, if proved, might

constitute such a "peculiar power of coercion." The allegation

is that "defendants were collectively able to negate the

safeguards that would have prevented any one group of defendants,

acting alone from accomplishing a fraud of this type." (App.

609).

Despite the fact that the pleading was sufficient to

state a claim of this type of civil conspiracy, however, Count X

was tried and the jury was ultimately instructed on a second and

quite different "civil conspiracy" cause of action.

Second. This second type of civil conspiracy is more

akin to a theory of common law joint liability in tort. It is

explicitly recognized in Massachusetts law.

See Gurney v. Tenney, 84 N.E. 428, 430
(Mass. 1908);
see also Phelan v. Atlantic Nat'l Bank, 17
N.E.2d 697, 700 (Mass. 1938)("[A]verment of
conspiracy does not ordinarily change nature
of cause of action [sounding in tort] nor add
to its legal force.").

In the civil context, both elsewhere and in Massachusetts, the

word conspiracy is frequently used to denote vicarious liability

in tort for "concerted action."

See W. Page Keeton, Prosser and Keeton on
Torts 322 (5th ed. 1984);
Restatement (Second) of Torts 876 cmt. b

-37-

(1977).

That is, the concept is invoked to support liability of one

person for a tort committed by another. For liability to attach

on this basis, there must be, first, a common design or an

agreement, although not necessarily express, between two or more

persons to do a wrongful act and, second, proof of some tortious

act in furtherance of the agreement.

See Restatement (Second) of Torts 876 cmt.
b.

Where two or more persons act in concert, each will be jointly

and severally liable for the tort.

See id.;
see also New England Foundation Co. v.
Reed, 95 N.E. 935, 935 (1911)("The gist of a
civil action of this sort is not the
conspiracy, but the deceit or fraud causing
damage to the plaintiff, the combination
being charged merely for the purpose of
fixing joint liability on the defendants.").

According to the Restatement:

For harm resulting to a third person from the
tortious conduct of another, one is subject
to liability if he (a) does a tortious act in
concert with the other or pursuant to a
common design with him . . . .

Restatement (Second) of Torts, 876 (1977).

The Supreme Judicial Court has implied that the

Massachusetts common law of civil conspiracy encompasses

liability of this nature, even if the elements of liability are

not in all respects identical to those defined in this section of

the Restatement.

Kyte v. Philip Morris, Inc., 556 N.E.2d
1025, 1027 (Mass. 1990)(citing Gurney, 84

-38-

N.E. 428, and declining to "pause to
determine whether the principles of 876 and
the law of the Commonwealth are, in all
respects, in complete accord" because the
parties accepted this section as governing
the principles of civil conspiracy in the
Commonwealth);
see also Gurney, 84 N.E. at 430 (alluding
to concert of action theory similar to
876(a));
Payton v. Abbott Labs, 512 F. Supp. 1031,
1035 (D. Mass. 1981)("The concert of action
theory in Massachusetts tracks 876(a) of the
Restatement.").

The district court, in this case, instructing the jury on civil

conspiracy, stated:

The essence of conspiracy is that the person
agreed with one or more other persons [to
commit an unlawful act] . . . . Plus for
conspiracy . . . somebody has to do something
to attempt to make it come about.

(App. 4817-18).

Although this instruction is not precisely in accord with

Restatement 876, the appellant has not presented any issue

before this court regarding the instruction. In any event, she

would be precluded from doing so here, not having objected to the

instruction in the district court. Fed. R. Civ. P. Rule 51.

She did, however, challenge the sufficiency of the

evidence by her motion for judgment as a matter of law. We

conclude, nevertheless, that we need not determine the precise

state of Massachusetts law on concerted action in tort, because

under any plausible formulation of Massachusetts law, a jury

reasonably could find that Betty Arhaggelidis acted in concert

with her husband and fellow Rodco/P&B Autobody defendant to

defraud Aetna.

-39-

The jury, with support in evidence, found that

Rodco/P&B Autobody was associated with thirty-seven fraudulent

claims that were submitted to Aetna, and that Betty Arhaggelidis

was directly involved in six of those claims.

From the evidence at trial, the jury reasonably could

find also that Ms. Arhaggelidis "acted in concert" with her

husband, the owner of Rodco/P&B Autobody, pursuant to a common

design. All six claims with which she was connected involved

claimed damage purportedly repaired at Rodco/P&B Autobody. All

six claims were supported by appraisals by Mr. Cummings, a co-

defendant. Her husband, Petros Arhaggelidis, allegedly repaired

many of the cars personally. Evidence was received that she

represented to Aetna that the repairs had been made. Also,

evidence was received of other fraudulent conduct on the part of

Mr. Arhaggelidis: he was a claimant on several claims the jury

found to be fraudulent, and he made payments to Mr. Cummings

totalling over $35,000, which the jury could have inferred to be

bribes. From the evidence as a whole, the jury could infer an

agreement between Betty Arhaggelidis and her husband, under which

they played different roles, but nevertheless acted together with

a common design to defraud Aetna.

IV. SUBMISSION OF CLAIMS TO THE JURY IV. SUBMISSION OF CLAIMS TO THE JURY

The Arsenal appellants argue that only sixteen claims

involving the Arsenal defendants should have been submitted to

the jury, instead of the thirty-three claims involving the

Arsenal defendants on which evidence was heard. The appellants

-40-

correctly assert that only sixteen of these thirty-three claims

were made to Aetna; the other seventeen claims were made to other

insurance companies (except for Tareh Tirinkian's worker's

compensation claim).

Aetna recovered damages for the sixteen automobile

insurance claims paid by Aetna -- claims the jury found to be

fraudulent. The trial court admitted evidence of the other

seventeen claims because each was relevant to the determination

of fraud with respect to one or more of the sixteen Aetna claims

at issue. For example, many of the claims to other insurance

companies duplicated one or more of the claims to Aetna. In one

or more instances, damage that was allegedly sustained in one

accident was later reported to Aetna in connection with another

alleged accident. On this appeal we need not decide whether the

district court was correct in admitting the evidence

corresponding to each of the seventeen claims because, although

in some instances the appellants objected to the introduction of

this evidence at trial, their briefs in this court have not

directly challenged these rulings of the district court.

Instead, the appellants argue that the verdict form

should not have asked the jury to determine whether each of these

seventeen other claims was fraudulent. We will assume, without

deciding, that the trial court's inclusion in the verdict form of

questions about these seventeen claims was unnecessary because at

most they concerned findings of an evidentiary nature rather than

findings on ultimate issues of fact that had to be decided to

-41-

determine whether each element of some claim or defense was

proved. Since the appellants do not even articulate grounds of

an argument for prejudicial error, however, much less show that

they were in fact prejudiced in any way by the submission of

these seventeen other insurance claims to the jury, we have no

occasion to determine whether their submission was improper. The

trial court did consider and reject the Arsenal defendants'

arguments that they were prejudiced by the jury's hearing

evidence of these seventeen claims. The trial court allowed the

evidence because it tended to support a finding of a common

pattern and scheme of fraud that the jury might find extended to

all the Aetna claims and others as well. Even assuming that an

issue regarding admissibility of the evidence is properly

preserved for our consideration, we conclude that this ruling was

not an abuse of discretion. Nor was it an abuse of discretion to

submit to the jury questions about these claims. It is true that

the jury's findings with respect to the seventeen other insurance

claims were not essential to the judgment entered on the verdict.

We note, however, that an argument can be made, although the

appellee does not advance it on appeal (and need not do so in

view of other findings), that each of these claims, if found to

constitute mail fraud, would constitute a predicate act for the

purposes of Count VI, the substantive RICO violation with Arsenal

Auto as the enterprise. For example, one could argue that two

related, fraudulent claims, although one was submitted to Aetna

and one was submitted to another insurance company, would

-42-

constitute a "pattern of racketeering activity" through which the

defendantsparticipated inthe conductof theaffairs ofArsenal Auto.

In considering the sufficiency of evidence, we need not

address the merits of such an argument because even when limiting

the scope of our review of the evidence to the sixteen Aetna

insurance claims, we find that there was sufficient evidence to

support the finding that each of the Arsenal defendants violated

RICO 1962(c) by committing two related, predicate acts of mail

fraud.

V. UNFAIR TRADE PRACTICES: MASS GEN. L. CH. 93A V. UNFAIR TRADE PRACTICES: MASS GEN. L. CH. 93A

Mass. Gen. L. ch. 93A prohibits "unfair or deceptive

acts or practices in the conduct of any trade or commerce." Mass

Gen. L. ch. 93A 2. The statute provides for treble damages in

the case of a willful violation of the statute. The jury found

that Zareh Tirinkian, Jack Markarian, and Peter Markarian's

deceptive business practices constituted a willful violation of

this statute.

Appellants contend that their dealings with Aetna were

purely personal and that they did not violate this statute,

because they did not deal with Aetna in a business context.

Appellants are correct in asserting that the phrase

"persons engaged in . . . trade or commerce" refers specifically

to individuals acting in a business context. See Lantner v.

Carson, 373 N.E.2d 973 (Mass. 1978). Contrary to the appellants'

assertions, however, the evidence was sufficient for the jury to

find that these three defendants were acting in a business

-43-

context and engaged in unfair or deceptive business practices in

violation of this statute.

All three defendants were involved in the Arsenal Auto

business: Zareh Tirinkian was an owner and Jack and Peter

Markarian performed repair work. The jury found that family

members and friends of these defendants submitted fraudulent

claims to Aetna for damages. Most of these cars were appraised

by Aetna appraisers, and most of the repair work was allegedly

performed at Arsenal Auto. Many of the work completion forms

submitted to Aetna with respect to these claims bear the stamp

"Arsenal Auto Repairs," certifying that Arsenal Auto completed

the repair work.

Under Massachusetts law, "unfair and deceptive acts or

practices" include acts of fraud.

See Evans v. Yegen Associates, Inc., 556 F.
Supp. 1219, 1227 (D. Mass. 1982)("Acts of
fraud clearly fall within 2 [of Mass Gen. L.
ch. 93A].");
see also Heller v. Silverbranch Const.
Corp., 382 N.E.2d 1065, 1069 (Mass.
1978)(Chapter 93A expands common law notion
of fraud).

We conclude that the evidence was ample to support

findings of fraudulent practices by these three defendants. From

the evidence before them, the jury could find that these three

defendants used deceptive business practices in their dealings

with Aetna in violation of Mass. Gen. L. ch. 93A.

VI. JURY INSTRUCTIONS VI. JURY INSTRUCTIONS

In addition to arguing that the evidence was

-44-

insufficient to support the finding that each of the individual

Arsenal appellants violated 18 U.S.C. 1962(c) and 1962(d), the

appellants assign error in the district court's jury instructions

on these counts.

The court instructed the jury that "[t]he term

'participate in the conduct of an enterprise' includes the

performance of acts, functions or duties which are related to the

operation of the enterprise." The appellants argue that this

instruction on the meaning of the phrase "participated directly

or indirectly in the conduct of the enterprise's affairs" failed

to comport with the "operation or management" test adopted by the

Supreme Court in Reves v. Ernst & Young, 113 S.Ct. 1163 (1993).

The appellants are precluded from successfully making

this argument on appeal, however, since they failed to object on

this ground at trial. Fed. R. Civ. P. Rule 51. Although the

appellants contend that they objected to this instruction, the

most that can be said is that they objected to the "RICO -- Aetna

as the enterprise" charge on the ground that Aetna could not be

the enterprise as a matter of law. See App. 4833. The record

shows that the court did not interpret this to be an objection to

any jury instruction, but merely further argument in support of

their motion for judgment as a matter of law. See App. 4834

("You've made a directed verdict, I've overruled. Of course you

object to the theories going to the jury. . . . Your rights are

saved as to that."). In any case, even if this were to be

interpreted as an objection to the instruction, it is not

-45-

sufficient to preserve an issue for appeal because it does not

"state distinctly the matter objected to and the grounds for

objection."

Fed. R. Civ. P. Rule 51;
see also Jordan v. United States Lines,
Inc., 738 F.2d 48 (1st Cir. 1984)(holding
that appellant's objection to the trial
court's instruction on the definition of
"unseaworthiness" was not specific enough to
satisfy Rule 51).

Moreover, even if viewed as an objection, counsel's statement is

reasonably understood as an objection only to the definition of

"enterprise" and not to the definition of "participate in the

conduct of the affairs." The appellants never objected to the

district court's definition of "participate in the conduct of the

affairs of the enterprise," nor did they ever mention the Reves

test or offer any alternative to the instruction given by the

judge.

Although this jury instruction is arguably open to a

broader interpretation, it is also reasonably understood to

convey a meaning consistent with the Supreme Court's language in

Reves that in order to be liable under RICO, a defendant must

"participate in the operation or management of the enterprise

itself." Reves, 113 S.Ct. at 1173. "Because of the

[appellants'] failure to comply with Rule 51, we review the trial

court's instructions only for plain error." Poulin v. Greer, 18

F.3d 979, 982 (1st Cir. 1994). "The plain error rule should be

applied sparingly and only in exceptional cases or under peculiar

circumstances to prevent a clear miscarriage of justice." Id.

-46-

(quotations omitted). The alleged error in this instruction

fails to pass this test.

VII. JURY TRIAL ON DAMAGES VII. JURY TRIAL ON DAMAGES

A. Post-Verdict Hearings and the Standard of Decision

The Arsenal appellants challenge the judgment entered

against them on the ground that they were denied a jury trial on

damages in violation of the Seventh Amendment guarantee of the

right to a jury trial upon a timely demand. Fed. R. Civ. P. 38.

Appellants demanded a jury trial and agreed to a bifurcation of

liability issues and damages. Following the jury trial and jury

verdict on the issues of liability, the district court properly

determined that no genuine disputes of material fact remained

with respect to damages.

The appellants' challenge fails because, after the jury

verdict, damages could be determined purely "as a matter of law,"

in the sense that reasonable factfinders applying the correct

legal standard could come to but one determination as to the

amount of damages to be awarded under the jury's findings on

liability.

Precedents regarding summary judgment provide useful

guidance on issues arising after jury verdict in the first phase

of a phased trial such as occurred in this case.

In the pretrial context, regardless of any jury demand

made by the parties, summary judgment is warranted when no

triable fact issues have been identified.

See Anderson v. Liberty Lobby, Inc., 477

-47-

U.S. 242 (1986)(summary judgment is
appropriate when there are no disputed issues
of material fact);
see also Plaisance v. Phelps, 845 F.2d 107
(5th Cir. 1988)(plaintiff did not have an
absolute right to a jury trial where there
was no genuine issue of material fact, since
the function of a jury is to try disputed
material facts);
Bloomgarden v. Coyer, 479 F.2d 201, 206
(D.C. Cir. 1973)("The summary judgment
procedure is properly and wholesomely invoked
when it eliminates a useless trial. . . .").

In addition, under Federal Rule of Civil Procedure 16,

the court may take action to formulate and simplify the issues

"including the elimination of frivolous claims or defenses."

Fed. R. Civ. P. 16. Rule 16 also authorizes courts to take

action with respect to the "appropriateness and timing of summary

adjudication under Rule 56." Id. Moreover, Rule 16 was intended

to confirm the power of the court to "identify [] litigable

issues" without awaiting a formal motion for summary judgment.

Advisory Committee Notes, 1983 Amendment.

In this case, the trial judge's determination regarding

the damages to be awarded was made after the jury trial on

liability. At the conference on damages held after trial, the

court stated its intention to enter a judgment without another

trial if no genuine dispute of fact material to the damages

determination remained. In a conference with counsel, the court

stated, "[u]nder Rule 16, I have the power to narrow the issues

for trial . . . I can in effect talk through a proceeding akin to

a motion for summary judgment."

This court has held that a district court may grant

-48-

summary judgment sua sponte as long as two requirements are met.

Stella v. Town of Tewksbury, 4 F.3d 53, 55 (1st Cir. 1993).

"First the discovery phase must be sufficiently advanced that the

court can make an accurate determination of whether a genuine

issue of material fact [exists]." Id. (citation omitted).

Second, "the target must have been on notice to bring forth all

of its evidence." Id. "'Notice' in this context means that the

losing party . . . received a fair opportunity to put its best

foot forward." Jardines Bacata, Ltd. v. Diaz-Marquez, 878 F.2d

1555, 1560 (1st Cir. 1989).

These two requirements were met. The discovery phase

was not merely "sufficiently advanced." It was complete. And a

trial on the liability issues had been completed. The appellants

received notice and an opportunity to be heard. The district

judge, before entering judgment, allowed the parties an

opportunity to file written submissions on the issues that were

raised at the conference.

In their post-trial memorandum, the appellants made

substantially the same argument as they make before this court

(discussed below), and in both instances without any proffer that

they would be able to offer at a damages-phase trial any evidence

that would raise a genuine dispute of fact that might be resolved

by a factfinder in their favor.

B. The Alleged Need for a Jury Trial

The appellants argue that a jury trial on damages was

necessary to determine how much of each fraudulent claim was

-49-

legitimate, that reported losses were merely exaggerated, and

that Aetna's damages should be limited to the difference between

the payment made by Aetna and the actual loss to the appellant.

Each of these arguments fails because, as a matter of law, Aetna

is entitled to damages equal to the entire amount of its payments

on fraudulent claims, regardless of any portion of the claims

that might have been shown to be supportable if no fraudulent

enlargement of the claims had occurred.

We put aside Aetna's argument that appellants violated

the cooperation clause of the various policies under which claims

were made. In part that clause provides:

After an accident or loss, you or
anyone else covered under this policy
must cooperate with us in the
investigation, settlement and defense of
any claim or lawsuit. . . .

(App. 4800)(emphasis added). Earlier automobile insurance policy

forms, from which this language in the Aetna policies at issue

descended, contained an Assistance and Cooperation Clause, as it

was then called. That clause initially appeared among conditions

that applied only to liability coverages. The claims at issue

here were made under collision coverage. No Massachusetts

precedent has explicitly determined that this clause in policy

forms like those at issue here applies to collision coverage. In

these circumstances, any prediction about whether the Supreme

Judicial Court will hold that this clause applies to collision

coverage is speculative, but we need not make any prediction on

this matter in order to decide this case. We assume in

-50-

appellants' favor, without deciding, that the cooperation clause

in these Aetna policies does not apply to claims under collision

coverage.

The "cooperation clause," of course, is not the only

provision concerning the obligations of insureds and claimants

after an accident or loss. Other provisions concern giving

notice and filing a proof of loss.

Appellants contend that one or another of various

preclusion doctrines of insurance law bars Aetna from asserting

that making a fraudulent claim is a violation of any of the

provisions of the policy under which the claim is made. One

reason all of the appellants' preclusion arguments fail is that

on the facts of this case, as determined by supportable findings

of the jury, every claim included in the trial court's

calculation of the damages award has been found to be a

fraudulent claim. In addition, every claim for which the Arsenal

defendants were held liable was made within the scope of a RICO

substantive violation and a RICO conspiracy, and every claim for

which appellant Arhaggelidis was held liable was within the

finding against her on the ground of civil conspiracy.

A claimant, in making a fraudulent claim, was

committing a material breach -- indeed, a most fundamental breach

-- of the contract between Aetna and its policyholder. This is

true, of course, not only of a claim by the policyholder but also

of any claim under the policy by any other person entitled by the

terms of the policy to make a claim under the policy.

-51-

A breach as fundamental as this is a bar to the

assertion of any further rights under the contract by the party

guilty of the breach. This is a basic rule of contract law. See

E. Allan Farnsworth, Contracts 632-38 (2nd ed. 1990). It applies

to insurance contracts as well as other contracts.

Appellants contend that one or another of various

preclusion doctrines developed distinctively in insurance law

nevertheless bars Aetna from asserting fraud by the appellants in

this case. This contention fails because the jury findings in

this case have negated at least one of the essential elements of

each preclusion theory appellants attempt to invoke.

The jury's findings negate the voluntary relinquishment

of known rights that is characteristic of waiver in the classic

sense, the detrimental reliance by a claimant that is

characteristic of estoppel in the classic sense, the voluntary

choice of an option that is characteristic of election in the

classic sense, and insurer overreaching of a less informed and

unequal bargainer that is characteristic of cases in which

precedents have stretched doctrines of waiver, estoppel, and

election beyond their classic meaning to favor a disadvantaged

insured.

See generally id. at 92-102, 319-23, 586-
92;
John S. Ewart, Waiver Distributed Among the
Departments: Election, Estoppel, Contract,
Release, 7-9, 84-87 (1917);
John S. Ewart, Waiver or Election, 29 Harv.
L. Rev. 724 (1916).

Appellants have not cited any precedent, in

-52-

Massachusetts law or elsewhere, that supports application to any

part of the verdict and judgment in this case of any preclusion

doctrine establishing rights in favor of insurance claimants

beyond those provided by the terms of the contract of insurance.

These terms include the limitations, conditions, and exceptions

as well as its clauses granting and defining the scope of

coverage. Indeed, in view of the jury finding of a RICO

substantive violation with Aetna as victim, if there were any

need or occasion to invoke principles of preclusion rather than

ordinary contract doctrine to decide this case, the record would

be more congenial to preclusion against a fraudulent claimant

than to preclusion of any of Aetna's defenses.

Although the parties have not cited and we are not

aware of any Massachusetts precedent directly determining the

effect of fraudulent claims and RICO violations upon the measure

of recovery to which the insurer is entitled, Massachusetts

decisions on analogous issues support the judgment entered in

this case. For example, Massachusetts courts have held in a

number of different contexts that an insured who committed fraud

either in obtaining a policy or in making a claim was precluded

from recovering on a claim under the policy.

See Airway Underwriters v. Perry, 284
N.E.2d 604 (Mass. 1972)(holding that an
attempt to defraud the insurer was a
violation of the policy's cooperation clause
and a clause stating that the policy was void
in case of fraud, and therefore insurer was
relieved of its obligation to indemnify the
insured or defend on the insured's behalf);
Bockser v. Dorchester Mutual Fire Ins. Co.,
99 N.E.2d 640 (Mass. 1951)(holding that an

-53-

insured, whose property was destroyed by fire
and whose agent attempted to defraud the
insurance company by exaggerating the losses
was precluded from recovery under the policy
in light of a provision of the policy
rendering the policy void if the insured
attempted to defraud the company either
before or after a loss).

In addition, fraud on the part of a party to a contract

has been determined to be a breach of the covenant of good faith

and fair dealing. Glaz v. Ralston Purina Co., 509 N.E.2d 297

(Mass. App. Ct. 1987).

The appellants do not contend that the amounts that

Aetna paid out on the policies were ever in dispute. These

amounts were the only facts, in addition to the facts determined

by the jury in the liability phase, that were material to the

court's judgment. Although there may have been some dispute as

to the existence and extent of any actual losses by the

defendants, any dispute about these facts was not material to the

judgment because the appellants' fraud (by either exaggerating or

completely fabricating losses) precluded them from asserting any

right to recover for actual losses under the insurance contracts.

Since no triable fact disputes remained, the appellants were not

denied their right to a jury trial. The court's determinations

of the sums certain to be awarded against the defendants were

properly made as matters of law -- that is, by the judge without

submission to a jury.

VIII. ATTORNEYS' FEES VIII. ATTORNEYS' FEES

As a part of the judgment in this case, the district

-54-

court awarded $1,500,000 in costs, expenses, disbursements, and

attorneys' fees to the plaintiff. Under the terms of the

judgment, each individual Arsenal defendant is jointly and

severally liable for the entire amount of $1,500,000.

The sole challenge in this appeal to this award or the

amount of it is that the Arsenal appellants argue that the

district court improperly held them liable for not only the

attorneys' fees expended in this case but also the attorneys'

fees expended in a related case entitled Aetna Casualty and

Surety Co. v. Sport Auto Body, Inc., No. 91-11718 (the "Sport

case"). In the Sport case, Aetna alleged that Sport Auto Body,

Inc. and its operators were a part of the same conspiracy to

defraud Aetna, which included Arsenal Auto and the other autobody

shops. The Sport case was consolidated with this case on May 17,

1992. Subsequently, the Sport defendants defaulted and the Clerk

entered judgment against them.

The appellants argument fails because 18 U.S.C.

1964(c) authorizes the recovery of reasonable attorneys' fees by

a prevailing plaintiff in a civil RICO case. 18 U.S.C. 1964(c).

Since the Sport case was consolidated with this action and

judgment was entered against the Sport defendants and the

individual Arsenal defendants for the same RICO violations, the

district court correctly held the Arsenal defendants jointly and

severally liable for reasonable attorneys' fees expended by Aetna

for the entire suit. Arsenal appellants argue, but

unconvincingly, that the district court's order of consolidation

-55-

did not extend to the phased trial. The district court rejected

the argument, and we find no abuse of discretion in this ruling.

IX. PREJUDGMENT INTEREST IX. PREJUDGMENT INTEREST

Raising this issue for the first time in a reply brief

on appeal, appellant Jack Markarian challenges the inclusion, in

the judgment against him, of prejudgment interest on the treble

damages awarded under the RICO claims. He argues that since the

treble damages are punitive in nature and not compensatory,

prejudgment interest is inappropriate.

The appellant failed to raise the issue either at trial

or even in his opening brief, which was submitted on behalf of

all the Arsenal defendants. The first statement of this

contention appears in this appellant's reply brief, filed on his

behalf by new counsel representing him alone. In these

circumstances, we hold that he has failed to preserve this issue

for appeal.

American Automobile Manufacturers Assoc. v.
Commissioner, 31 F.3d 18, 25 (1st Cir.
1994)(appellant failed to preserve issue for
appeal when the argument was first raised in
his reply brief);
Frazier v. Bailey, 957 F.2d 920, 932 n.14
(1st. Cir. 1992)(same);
Pignons S.A. de Mecanique v. Polaroid
Corp., 701 F.2d 1, 3 (1st Cir. 1983)(same);
see also McCoy v. Massachusetts Institute
of Technology, 950 F.2d 13, 22 (1st. Cir.
1991), cert. denied, 112 S.Ct. 1939(1992)("It
is hornbook law that theories not raised
squarely in the district court cannot be
surfaced for the first time on appeal.").

"[A]n appellee is entitled to rely on the content of an

appellant's [opening] brief for the scope of issues appealed."

-56-

Pignons S.A., 701 F.2d at 3. When an argument is first raised

in a reply brief, the appellee is not given an adequate

opportunity to respond. See Sandstrom v. Chemlawn Corp., 904

F.2d 83, 87 (1st Cir. 1990). Moreover, the court of appeals is

deprived of the benefit of written submissions by all the

parties. Id.

This court has recognized that if exceptional

circumstances are shown, an issue may be considered even though

it has not been timely raised.

Id. (citing United States v. LaGuardia, 902
F.2d 1010, 1013 (1st Cir. 1990)).

Such exceptional circumstances include arguments that are "so

compelling as virtually to insure the appellant's success" or

arguments that must be ruled upon to avoid a miscarriage of

justice.

Johnston v. Holiday Inns, Inc., 595 F.2d
890, 894 (1st Cir. 1992).

The argument presented by appellant Jack Markarian is

not one that satisfies this standard. A district court's

decision to award prejudgment interest under RICO is ordinarily

subject to review under the "abuse of discretion" standard.

Cf. Earnhardt v. Commissioner of Puerto
Rico, 744 F.2d 1, 3 (1st Cir. 1984)(abuse of
discretion standard is applied to district
court's decision whether to award prejudgment
interest in a Title VII case);
see also Abou-Khadra v. Mahshie, 4 F.3d
1071, 1084 (2nd Cir. 1993), cert. denied, sub
nom. Bseirani v. Mahshie, 114 S.Ct. 1835
(1994) ("Since the RICO statute does not
contain any provisions concerning the award
of prejudgment interest, the district court
had discretion as to whether to award such

-57-

interest.");
Louisiana Power and Light Co. v. United Gas
Pipe Line Co., 642 F. Supp. 781 (E.D. La.
1986)(same).

We recognize that there is some force in the

appellant's argument that the district court abused its

discretion in awarding prejudment interest. The appellant

reasons that treble damages under RICO constitute punitive

damages, and that since prejudgment interest on punitive damages

is ordinarily inappropriate, the district court erred in awarding

prejudgment interest in this case.

Cf. McEvoy Travel Bureau, Inc. v. Norton
Co., 563 N.E.2d 188, 196 (Mass. 1990)(holding
that prejudgment interest should not be
awarded in Mass. Gen. L. ch. 93A cases
because multiple damages are punitive in
nature);
Wickham Contracting Co. v. Local Union No.
3, Int'l Brotherhood of Elec. Workers, 955
F.2d 831, 834 (2nd Cir.), cert. denied, 113
S.Ct. 394 (1992)(prejudgment interest should
not be awarded when damages are punitive in
nature).

It may reasonably be argued, however, that RICO damages are

primarily compensatory in nature, and thus prejudgment interest

was properly awarded.

Cf. Liquid Air Corp. v. Rogers, 834 F.2d
1297, 1310 (7th Cir. 1987), cert. denied 492
U.S. 917 (1989)("Although there is some sense
in which RICO treble damages are punitive,
they are largely compensatory in the special
sense that they ensure that wrongs will be
redressed in light of the recognized
difficulties of itemizing [the damages caused
from racketeering activity].").

Thus, the appellants' argument is not so compelling as to ensure

the appellant's success. Nor is his argument so clearly correct

-58-

that a failure to rule in his favor on this issue constitutes a

miscarriage of justice. Therefore, the appellant cannot prevail

under the Johnston standard.

X. SEVERANCE X. SEVERANCE

The Arsenal defendants challenge the district court's

denial of their motion for a mistrial at the close of the

plaintiff's evidence. They argue that the district court should

not have tried the case against all fourteen defendants in the

same proceeding because of the potential for jury confusion. In

addition, the Arsenal defendants argue that they were prejudiced

by the jury's hearing evidence concerning the other defendants.

A mistrial need not be allowed absent a clear showing

of prejudice. United States v. Schlamo, 578 F.2d 888, 891 (1st

Cir. 1978). We review the mistrial ruling for "abuse of

discretion." United States v. Dockray, 943 F.2d 152, 157 (1st

Cir. 1991).

The defendants' challenge to the trial court's failure

to sever fails in this instance for several reasons.

First. The Arsenal defendants never moved for a

separate trial of the claims against them. Before the trial

began, they were fully aware that all the defendants were to be

tried together and were informed of the identity of every witness

to be called and every exhibit to be offered. Absent a showing

of materially changed circumstances after the trial began, the

Arsenal defendants' failure to move for severance before trial

began precludes both their motion at the close of the plaintiffs'

-59-

evidence and their challenge before this court. Absent special

circumstances, a party is required to object to an allegedly

erroneous or prejudicial procedure while the court has an

opportunity to correct it.

Cf. Computer Systems Engineering, Inc. v.
Qantel Corp., 740 F.2d 59, 69 (1st Cir.
1984)("A party may not wait and see whether
the verdict is favorable before deciding to
object.");
see also Harris v. Chanclor, 537 F.2d 203
(5th Cir. 1976)(a motion for new trial on the
grounds that the defendant should have been
given a separate trial was properly denied in
light of the defendant's failure to press a
pre-trial motion to sever).

Second. The defendants have not made the clear showing

required to support a determination that the district court's

denial of a mistrial was an abuse of discretion. No appellant

has shown any prejudice from having all the claims at issue tried

together. No basis appears in the record for this court to

conclude that the jury was unable to differentiate among the

defendants and to distinguish the evidence relating to each

defendant. Moreover, the district court's jury instructions

cautioned the jury to consider the claims against each defendant

separately, thus giving added protection against any potential

prejudice.

See United States v. Chamorro, 687 F.2d 1,
6 (1st Cir.), cert. denied, 459 U.S. 1043
(1982)(cautionary jury instructions dispelled
any significant risk of unfair prejudice).

In fact, the jury found some defendants liable on specified

theories and found other defendants not liable on those theories,

thus reinforcing the inference that the jury understood its

-60-

responsibility and was not confused by the size and complexity of

the case.

Cf. United States v. Figueroa, 976 F.2d
1446, 1452 (1st Cir. 1992), cert. denied, 113
S.Ct. 1346 (1993) (acquittals of some
defendants on some counts was a factor
relevant to decision to uphold a denial of
severance).

Third. Viewing the motion for a mistrial at the close

of the defendant's evidence as a delayed motion for severance

does not change the result. This court will reverse a district

court's refusal to sever only upon a finding of manifest abuse of

discretion.

See United States v. Olivo-Infante, 938
F.2d 1406, 1409 (1st Cir. 1991).

The appellants "must demonstrate that the joint trial prevented

the jury from separating the evidence against each defendant and

reaching a reliable verdict."

United States v. Brandon, 17 F.3d 409, 440
(1st Cir.), cert. denied, 115 S.Ct. 80
(1994).

Again, the jury's verdict shows that the jury

considered the evidence against each defendant separately.

Also, we reject the appellants' suggestion that the

district court's dismissal of Count VII (asserting a substantive

RICO violation allegedly involving an overall association-in-fact

enterprise) was an indication of the appropriateness and need for

a separate trial. The district court denied the defendants'

motion for judgment as a matter of law on Count IX (the RICO

conspiracy) and Count VIII (the RICO substantive violation with

-61-

Aetna as the enterprise), and the jury ultimately found the

defendants liable on these theories. Severing the Arsenal

defendants would have required Aetna to present all of the

evidence twice in order to prove the scope of the same fraudulent

scheme in each of two separate trials. The court's dismissal of

Count VII in no way, either explicitly or implicitly, determined

that a separate trial was needed for any of the multiple counts

remaining after the dismissal.

Appellant Arhaggelidis is another party who asserts on

appeal that the district court failed to provide her with a

separate trial. She, too, is precluded from arguing this ground

before this court because she did not move for a separate trial

until after the trial had been completed. Having never moved

before the verdict for a separate trial for herself alone, or

even for the Rodco/P&B Autobody defendants as a group, she is in

no position to complain now that she should have been the sole

defendant in a separate trial. Taking her argument to its

logical conclusion, that each defendant should have had a

separate trial, would require that Aetna present and the court

hear the same evidence up to fourteen times -- one for each

defendant who chose to go to trial. No more need be said.

XI. PRETRIAL ATTACHMENTS XI. PRETRIAL ATTACHMENTS

The Arsenal defendants argue that the pretrial

attachments obtained by Aetna in the district court violated due

process. Their challenge of the pretrial attachments was

rejected six times at the district court level. The challenge

-62-

fails again, for several reasons.

First. The appellants' reliance upon the Supreme

Court's decision in Connecticut v. Doehr, 501 U.S. 1 (1991),

holding that the Connecticut attachment statute violated due

process, is not well-founded. The procedure used in this case

was based on the Massachusetts Rules of Civil Procedure; that

procedure and its implementation by the magistrate judge

comported with due process and was entirely consistent with

Doehr.

See Digital Equipment Corp. v. Currie
Enterprises, 142 F.R.D. 16, 26 (D. Mass.
1992)(upholding Massachusetts attachment
statute against due process challenge under
Doehr).

Although the attachments were issued ex parte, the plaintiffs

made the requisite showing of an exigent circumstance -- a

clear danger that, if notified in advance, the defendants would

convey the property or remove it from the state.

Doehr, 501 U.S. at 16 (recognizing that a
properly supported "allegation that [the
defendant] was about to transfer or encumber
his real estate" would be an exigent
circumstance permitting ex parte attachment).
Second. Although the assets were first attached by an

ex parte proceeding, the magistrate judge later conducted a

lengthy hearing at which the appellants were afforded "more than

adequate due process." (Magistrate's Order Re: Second Motion to

Dissolve Ex Parte Attachments, App. 852) As a result of this

hearing, the magistrate judge determined that the pretrial

attachments should not be dissolved. Id. Judge Young

subsequently denied the appellants motion for reconsideration of

-63-

the magistrate judge's decision, implicitly determining that any

possible defect in the ex parte procedure was irrelevant in "view

of the extensive hearing held by the magistrate judge."

(Endorsed Order, App. 903.)

Third. The conclusion that appellants' have no basis

for relief from the attachments at this time is reinforced upon

the rejection of other contentions on this appeal and upon the

affirmance of the final judgment against the defendants in an

amount greatly in excess of the value of the attached assets. In

light of their joint and several liability for $2,369,901.72, no

basis remains, if ever there was one, for an argument that the

attachment of their assets should now be vacated. Determining

what process is due in pre-judgment attachment proceedings

requires a consideration of the risk of an erroneous deprivation

of property. See Doehr, 501 U.S. at 12. With the affirmance of

the judgment against all attacks on other grounds, no longer will

there be any such risk. Aetna has prevailed and subsequent

events have demonstrated that no unwarranted deprivation of

property occurred.

XII. ALLEGED PLEADING DEFICIENCIES XII. ALLEGED PLEADING DEFICIENCIES

The appellants challenge the verdict entered against

them on Count VI, which alleged a substantive RICO violation with

Arsenal Auto Repairs, Inc. as the enterprise. They argue that

the district court erred by not granting their Rule 12(b)(6)

motion to dismiss Count VI of the amended complaint for failure

-64-

to state a cause of action.

The appellants' argument is based on what Aetna claims

is a typographical error. Appellants argue that they were

confused by paragraph 460 of the amended complaint, which alleges

that "[e]ach of the individual policyholder/claimants named in

paragraph 38" participated in the conduct of Arsenal's affairs.

Paragraph 38 names Vachig Petrosyans, but none of the Arsenal

appellants. Appellants imply that they were prejudiced by this

error because they had to "guess" at the meaning of Count VI.

The appellants' argument, which the trial court

rejected four times, fails again. Paragraph 459 of the amended

complaint clearly alleges that Tareh Tirinkian, Lena Tirinkian,

Peter Markarian, and Jack Markarian conducted Arsenal's affairs

through a pattern of racketeering activity. The appellant cannot

deny that Count VI was directed towards these four defendants.

Although Count VI does not expressly name Tarja

Markarian, the fifth individual Arsenal defendant, paragraph 460

does refer to "individual policyholders/ claimants" and paragraph

42 states that Tarja Markarian was a policyholder associated with

Arsenal Auto. Therefore, appellants' assertion that they were

confused is both unreasonable and unpersuasive. Moreover,

Aetna's Pretrial Statement of Claims and Damages, which was

submitted four months before trial, states that Count VI is

directed against the five individual Arsenal defendants and lists

them by name. In these circumstances, the appellants never had

any basis for asserting that they were prejudiced at trial by any

-65-

confusion purportedly caused by the amended complaint.

XIII. COURT'S ANSWER TO JURY QUESTION XIII. COURT'S ANSWER TO JURY QUESTION

The Arsenal appellants challenge the judgment against

them on Count VIII, the RICO substantive violation with Arsenal

as the enterprise, on the ground that the judge, in response to a

question by the jury during their deliberations, instructed the

jury that the Arsenal defendants were not part of such a

conspiracy.

Only one sentence of the appellants' brief addresses

this issue. The appellant provides no argument or authority for

its

proposition. This court has previously held that an argument

that is presented in "such a cursory and mechanical fashion" is

rendered unpreserved on appeal.

Gamma Audio & Video, Inc. v. Ean-Chea, 11
F.3d 1106, 1112 (1st. Cir. 1994)("We have
consistently admonished litigants that they
cannot simply present this court with a
shopping list of arguments and then expect up
to both develop and address each one.");
Ryan v. Royal Ins. Co., 916 F.2d 731, 734
(1st Cir. 1990)("[I]ssues adverted to on
appeal in a perfunctory manner, unaccompanied
by some developed argumentation, are deemed
to have been abandoned.").

Similarly, the appellants have not properly preserved this issue

before this court.

Although the appellants are not entitled to a ruling on

this matter, we note in any event that no basis for any relief

appears in the record. In response to a written question by the

jury, the court instructed the jury again on the various RICO

-66-

theories alleged by Aetna and used a diagram to illustrate some

aspects of his instruction. Although it is not clear what aspect

of the response by the court the appellants' are attempting to

put in issue, our examination of the record reveals that the

appellants' have mischaracterized or grossly misinterpreted the

court's response to the jury's question.

From the record, it appears that the court drew a

diagram representing the different enterprise theories that had

been submitted to the jury. Although the record before us does

not include this diagram, the record does include the court's

oral instructions.

One of the theories submitted to the jury, but not at

issue in this appeal, was that two or more of the body shops,

other than Arsenal Auto Repairs, Inc., constituted the "Allston

group" enterprise. The Arsenal defendants were never alleged to

be part of the "Allston group." Therefore, the court pointed out

that the defendants associated with the body shops that allegedly

constituted the "Allston group" did not include the Arsenal

defendants. The court's description of the "Allston group"

theory had no bearing on the Arsenal defendants. Nothing in the

court's detailed response to the jury's question indicated that

the Arsenal defendants were not alleged to have participated in

the affairs of the Aetna enterprise. In these circumstances, we

discern no basis to conclude that the trial court's response to

the jury's question was inconsistent with the court's earlier

instructions to the jury, or with the court's earlier rulings on

-67-

the theories to be submitted to the jury, or with the verdict

ultimately rendered. Thus, the appellants could not prevail on

this issue even if they had preserved it.

XIV. SUFFICIENCY OF EVIDENCE XIV. SUFFICIENCY OF EVIDENCE

A. The Arsenal Appellants

Having addressed in Parts III.C and III.D, supra, the

Arsenal appellants' arguments with respect to the elements

necessary to prove liability for each of the two RICO offenses,

we turn here to the evidence against each of the individual

Arsenal defendants. In addition to the explanation in Part

III.D, supra, of the evidence of RICO conspiracy, we note here

that there was sufficient evidence against each defendant for the

jury to find that each defendant conspired to violate RICO. We

also conclude that the evidence of an ongoing succession of

fraudulent claims was sufficient to meet the continuity

requirement necessary to establish a pattern of racketeering.

Although the jury found that sixteen Aetna claims that were

connected with the Arsenal defendants were fraudulent, only two

predicate acts are necessary to constitute a pattern of

racketeering. Thus, we need only to conclude, with respect to

each Arsenal defendant, that there was sufficient evidence to

support findings of the fraudulent nature of two claims in which

the defendant was involved.

1. Zareh Tirinkian

With respect to Mr. Tirinkian, there was ample evidence

of mail fraud. Mr. Tirinkian was a key figure of the Arsenal

-68-

branch of the RICO conspiracy. As owner and operator of the

Arsenal Body Shop, he was directly involved in all aspects of the

fraudulent scheme. Automobiles were appraised and allegedly

repaired at his shop. On behalf of Arsenal Auto, Mr. Tirinkian's

name appears on appraisal forms, agreeing, on behalf of Arsenal

Auto, to perform repair work. As either an insured, or a

claimant, or a person aiding an insured or claimant under Aetna

policies, Mr. Tirinkian submitted fifteen insurance claims that

the jury found to be fraudulent.

In 1988, Mr. Tirinkian submitted a claim to Aetna,

stating that his 1976 Rolls Royce was hit from behind and forced

into a guardrail by an unknown vehicle. Mr. Tirinkian claims to

have driven home after this alleged accident. Dexter, the Aetna

appraiser, determined that the car needed $6,780.92 in repairs.

When called for a second appraisal, Dexter determined that in

fact it needed $12,023.00 in repairs, $8,090.17 for parts alone.

At trial, Mr. Tirinkian conceded that the only part he purchased

was an axle for $300. From this evidence, the jury could

reasonably find that Mr. Tirinkian submitted a fraudulent claim.

In 1989, Mr. Tirinkian reported that his 1976 Rolls

Royce struck the back of a BFI garbage truck that sped off after

the collision. Mr. Tirinkian received payment of $20,000 from

Aetna for this claim. The record contains, in addition to other

evidence presented at trial supporting the suggestion, the

testimony of an expert witness in accident reconstruction, who

said that BFI operated no truck "that matched in any shape or

-69-

form the damage that [he] saw on this Rolls Royce." The expert

testified also that the damage must have been caused by a

person's striking the car, or driving it into other objects, at

least seven times, at different angles and speeds. From this

evidence, the jury could reasonably find that Mr. Tirinkian

submitted a fraudulent claim to Aetna.

Since the jury reasonably could have found that these

two related acts of mail fraud constituted a pattern of

racketeering activity, Mr. Tirinkian's liability on the theories

of RICO conspiracy (Count IX) and RICO substantive violation with

Aetna as the enterprise (Count VIII) is established.

2. Lena Tirinkian

Ms. Tirinkian was an officer of Arsenal Auto Repairs,

Inc. She testified that she performed bookkeeping and accounting

for Arsenal Auto, dealt with insurance companies, and received

checks from them. From her proximity to the Arsenal operations,

taken together with other evidence, the jury could infer that she

conspired with her husband and other defendants. Like Mr.

Tirinkian, Ms. Tirinkian was involved in several claims that the

jury found to be fraudulent. A finding that she committed mail

fraud with respect to two or more related claims would support,

in turn, the finding that Ms. Tirinkian violated 1962(c) by

knowingly participating in the affairs of Aetna through a pattern

of racketeering activity. We summarize the evidence against Ms.

Tirinkian with respect to two claims.

The Tirinkians allege that Ms. Tirinkian's 1979 Rolls

-70-

Royce was damaged twice during transport by Forge Motors Auto

Transport -- while being shipped to the Tirinkian's Florida home

in the fall of 1988 and while being shipped back to Massachusetts

in the spring of 1989. The second claim to Aetna alleged that a

$3,306.95 headlight switch was damaged in transit. Yet, at

trial, the owner of Watertown Foreign Car Center, Inc. testified

that he had noticed that the headlights were not working sometime

in the fall of 1988 and suggested to Mr. Tirinkian that he get a

new headlight switch.

It is Aetna's practice to require the insured to sign

completed work forms before obtaining payment from Aetna. Ms.

Tirinkian signed the completed work forms relating to these two

claims on her 1979 Rolls Royce. The forms stated that "all

damage to my auto was repaired in accordance with the appraisal."

At trial Ms. Tirinkian testified that she never saw the damage

allegedly sustained by this vehicle, nor did she ever see the car

at Arsenal Auto or any other auto repair shop. She admitted

that she endorsed and deposited in her bank account the checks

she received from Aetna with respect to these claims. Although

the completed work form with respect to the second claim stated

that the repairs were completed by Watertown Foreign Car Center,

Inc., the owner of that shop testified that no repairs were

completed there. From this and other evidence introduced at

trial, the jury reasonably could find that Ms. Tirinkian

defrauded Aetna by submitting these two false claims on her

automobile.

-71-

Evidence of these two acts of mail fraud, among others,

supported a jury finding of a pattern of racketeering activity by

Ms. Tirinkian from which the jury could find that Ms. Tirinkian

violated 1962(c) and (d). Thus, the district court properly

denied Ms. Tirinkian's motion for judgment as a matter of law.

3. Jack Markarian

Jack Markarian, brother of Lena Tirinkian, was an

officer and employee of Arsenal Auto Repairs, Inc. He testified

at trial that he performed repairs and managed the other

employees performing repairs, and that Mr. Tirinkian did mostly

paperwork. Given evidence that he was in charge of repair work

at Arsenal Auto where many of the cars that were the subject of

fraudulent claims were appraised and purportedly repaired, the

jury could infer that he knew and participated in the fraudulent

scheme and conspired with his brother-in-law and others.

In a reply brief filed on his behalf by new counsel

representing him alone, appellant Jack Markarian argues that the

district court improperly denied the motion for judgment as a

matter of law with respect to him. He distinguishes himself from

the other defendants in that he was neither an insured nor a

claimant with respect to any of the claims the jury found to be

fraudulent. His strongest argument is that the plaintiff failed

to establish that he committed or agreed to commit the two

predicate acts necessary for a jury to find him liable under

either 1962(c) or (d). After close scrutiny, however, this

argument fails along with all others made on his behalf.

-72-

It was not necessary for the jury to find that Jack

Markarian committed mail fraud as a principal. Under RICO,

aiding or abetting the commission of mail fraud also constitutes

a "predicate act," because aiding and abetting mail fraud is a

violation of 1341, the mail fraud statute itself. Therefore,

all we have to decide is whether there was evidence sufficient

for the jury to conclude that Jack Markarian aided and abetted

another Arsenal defendant in the commission of two acts of mail

fraud.

From Jack Markarian's formal position and extensive

involvement in the everyday operations of Arsenal Auto, the jury

reasonably could infer that Jack Markarian aided and abetted his

friends and relatives in submitting fraudulent claims. This

inference is supported as well by other circumstantial evidence

introduced at trial.

One example is that Jack Markarian testified that he

was at Arsenal Auto when the 1976 Rolls Royce was towed in after

allegedly hitting the BFI truck and that he "went over" the car

with the Aetna appraiser who arrived later. Given the fact that

Markarian placed himself at the scene with the 1976 Rolls Royce,

the jury could infer that he helped to inflict damage on the car

before the arrival of the Aetna appraiser, who this time was

neither Dexter nor Cummings, or that at the least Jack Markarian

knew about and helped to conceal from the appraiser what had been

done.

Another example concerns a check written by Jack

-73-

Markarian. At trial Jack Markarian was asked about a check for

$9,000 that he wrote to Mr. Keshishian, a person who was involved

with two of the allegedly fraudulent claims submitted to Aetna.

Mr. Markarian testified that this check was a loan. Similarly, a

payment previously made by Keshishian's brother to Tirinkian for

$13,000 had been explained as a loan, but was made on the same

day that Mr. Keshishian received a payment from Aetna on a

fraudulent claim he had submitted on an automobile purportedly

repaired at Arsenal Auto. The jury, not believing this

explanation, could have inferred that the payment by Keshishian's

brother to Tirinkian was a kickback. Similarly, the jury

reasonably could choose to discredit Jack Markarian's explanation

for his own $9,000 payment and infer that Jack Markarian was

providing a kickback to Mr. Keshishian in connection with another

fraudulent claim. Thus, the jury could infer that Jack Markarian

aided and abetted the commission of a fraud upon Aetna.

In many respects, Jack Markarian's testimony

corroborated that of his brother-in-law, Zareh Tirinkian. For

example, Jack Markarian testified that he saw his brother-in-law

working on the 1976 Rolls Royce after the "guardrail" accident in

June 1988, and even stated that he himself had done some of the

repair work. Jack Markarian also testified that the reason

Arsenal did not make available any autobody shop records or

documents for discovery or at trial was that they were destroyed

by flooding in the autobody shop. The jury could infer, from

Jack Markarian's willingness to corroborate his brother-in-law's

-74-

story, which the jury appears to have discredited, that he was

actively involved in the racketeering activities of Arsenal Auto.

As the head of repairs at Arsenal Auto, Jack Markarian

stood to benefit from Arsenal Auto's obtaining payment from Aetna

for work that was never performed. At trial, Jack Markarian

testified that he and his employees repaired many of the cars

that the plaintiff alleged, and offered evidence to show, were

never damaged. He also testified to the general procedure for

dealing with insurance companies, appraisers, and customers when

an accident occurs. The jury could infer that, in his position

at Arsenal Auto, Jack Markarian frequently met with appraisers,

including Cummings and Dexter, and discussed estimates for

repairs. The jury could infer that Jack Markarian, in this way,

aided and abetted his friends and relatives in submitting

fraudulent claims to Aetna.

Despite appellant Jack Markarian's assertions to the

contrary, the record contains ample evidence for the jury to find

that he aided and abetted others in filing fraudulent claims,

thereby committing two or more predicate acts constituting a

pattern of racketeering activity. Therefore, the jury reasonably

could find that Jack Markarian participated in the affairs of

Aetna, the enterprise, in the substantive violation of 1962(c)

and in the RICO conspiracy in violation of 1962(d), through a

pattern of racketeering activity.

4. Peter and Tarja Markarian

-75-

Appellant Peter Markarian, brother of Lena Tirinkian,

was an employee of Arsenal Auto during the course of the

conspiracy except for six months during 1988. He testified that

he had done automobile repair work since he was a teenager. He

also testified that when he was at Arsenal Auto he would see

Dexter and Cummings, the Aetna appraisers, as frequently as twice

a week.

Appellant Tarja Markarian is the wife of Peter

Markarian and co-owner of their 1970 Mercedes. Tarja admitted

that she sometimes worked at Arsenal Auto Repairs, Inc.,

answering phones and running errands.

The evidence shows that Peter Markarian and his wife

Tarja Markarian submitted six claims on their Mercedes, two of

which were to Aetna, within a span of three years, from 1986 to

1988. The jury found four of these claims to be fraudulent.

The first claim the Markarians reported to Aetna

alleged that their car was damaged while parked at a movie

theater. The description of the damage to the car was identical

to that alleged in a previous claim to another insurance company.

Six months later, the Markarians submitted a second claim to

Aetna alleging that their Mercedes had been vandalized while

parked at the Burlington Mall. Fifteen months earlier, Peter

Markarian's sister, Ms. Garabedian, had submitted a claim to

Aetna alleging that her Mercedes had been vandalized while parked

at the Burlington Mall.

Peter Markarian testified that he repaired the car

-76-

after both alleged claims and that he purchased the necessary

parts with cash. He was unable to provide any records or

receipts of such purchases. Tarja Markarian signed the completed

work forms for both sets of repairs. Each form stated that the

repairs were completed by Arsenal Auto. She also endorsed and

deposited the checks from Aetna to the Markarians relating to

these claims. At trial, Tarja Markarian admitted that she had

never seen the damage on the car and had never seen any repairs

being made. An Aetna investigator who examined the car pursuant

to a court-ordered inspection, testified at trial that many of

the alleged repairs had never been made and that some of the

alleged damage never occurred.

From the evidence concerning these two claims and the

evidence concerning the Markarians' claim history, the jury

reasonably could infer that the Markarians participated in the

affairs of Aetna through a pattern of racketeering activity,

consisting of acts of mail fraud, in violation of 1962(c). From

Peter Markarian's employment at Arsenal Auto and his relationship

with the Aetna appraisers, the jury could infer that Peter

Markarian conspired with the other defendants in violation of

1962(d). Similarly, from Tarja Markarian' false representations

with respect to the Aetna claims and her work, albeit limited, at

Arsenal Auto, the jury could infer that she conspired with her

husband and other Arsenal defendants and was a member of the RICO

conspiracy.

B. Betty Arhaggelidis

-77-

Much of the evidence against appellant Betty

Arhaggelidis has been described in Part III.E, supra. We add

here, some additional details that further demonstrate that the

evidence supported the jury's findings.

In addition to finding that Mr. and Ms. Arhaggelidis

acted in concert, the jury reasonably could find that Ms.

Arhaggelidis actively committed common law fraud by submitting

false claims to Aetna. To establish fraud (the tort of common

law deceit), the plaintiff must show that the defendant made a

false statement of material fact with knowledge of its falsity in

order to induce the plaintiff to act, and that plaintiff

justifiably relied on the false statement to the plaintiff's

detriment. Danca v. Taunton Savings Bank, 429 N.E.2d 1129, 1133

(Mass. 1982).

Betty Arhaggelidis used two cars to obtain payments

from Aetna. The title to one of the cars, a Mercedes 380 SL, was

in the name of her mother, Ms. Paikopoulos. The evidence

supported a finding, however, that Betty Arhaggelidis was the

regular driver of the car, her mother had never purchased a car,

and her mother did not have a driver's license. When claims were

made to Aetna on this Mercedes 380 SL, Ms. Arhaggelidis received

the checks from Aetna at her own address, which was not Ms.

Paikopoulos's address. From this evidence, the jury could infer

that Ms. Arhaggelidis arranged for title to the car to be in her

mother's name in order to conceal fraudulent activity.

One of the claims submitted on the Mercedes 380 SL

-78-

alleged that Amir Lajervardi hit the parked car. Thirty-four

days later, the car reportedly hit another parked car owned by

Mohammad Mohammadi. Thirty-three days after that, the Mercedes

240D, title to which was in the name of Betty Arhaggelidis, was

allegedly rear-ended by Rahim Nima. At trial, Mr. Nima

testified that Mr. Mohammadi was his roommate and Mr. Lajervardi

was his classmate. Three months later, the Mercedes 240D

supposedly rear-ended a Mercedes owned by Mr. Diamondopoulos.

Mr. Diamondopoulos testified at trial that the accident never

happened. With respect to this accident, Betty Arhaggelidis

signed a "Total Loss Affidavit" and submitted it to Aetna. She

then received, endorsed, and deposited Aetna's payment into her

account.

From this and other evidence introduced at trial, the

jury could reasonably infer that Ms. Arhaggelidis acted in

concert with her husband to commit fraud and personally committed

acts of fraud. Therefore, Ms. Arhaggelidis was properly held

jointly and severally liable for all the claims associated with

Rodco/P&B Autobody.

CONCLUSION CONCLUSION

In summary, we conclude that none of the arguments

advanced on appeal supports reversal of any aspect of the

judgment in this case. The district court commendably fashioned

an order for phasing of trial in two consolidated cases, with all

disputed and material issues bearing on liability to be tried

before a jury in the first phase. In post-verdict proceedings

-79-

analogous to a hearing on a motion for summary judgment, the

district court correctly determined that no genuine dispute of

fact remained for jury determination and that final judgment

should be entered for Aetna on the jury verdict, establishing

liability, and on the court's calculation of damages based upon

facts disclosed on the record and not subject to genuine dispute.

The district court's pretrial order for phasing and its post-

verdict proceedings were well-tailored to the distinctive

characteristics of this legally and factually complex litigation.

Together they achieved fair and appropriate adjudication of all

claims and defenses on the merits. Proceeding in this fashion,

the court also effected substantial reductions of delay and cost

for the parties and the court system, an objective strongly

commended by Rule 1 of the Federal Rules of Civil Procedure.

The judgment of the district court is AFFIRMED.

-80-